[Crim. No. 20142. Aug. 24, 1978.]

In re TONY C., a Person Coming Under the Juvenile Court Law.
KENNETH F. FARE, as Acting Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
TONY C., Defendant and Appellant.

## COUNSEL

William T. Harter, under appointment by the Supreme Court, for Defendant and Appellant.

Paul Halvonik, State Public Defender, Charles M. Sevilla, Chief Assistant State Public Defender, Richard A. Curtis and Cheryl Lutz, Deputy State Public Defenders, Thomas E. Bruyneel and Susan Rutberg as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Jack T. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, William A. McKinstry and William M. Baldwin, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Tony C., a minor, appeals from two orders adjudging him a ward of the juvenile court (Welf. & Inst. Code, § 602) upon findings that

he received stolen property (petition "A") and committed rape by threat of great bodily harm (petition "C").

*Petition "A"*

The evidence connecting Tony with the offense alleged in petition "A" was found in a search of his person while he was being booked after his arrest on an unrelated charge. His principal contention is that the evidence was illegally obtained because the police did not have sufficient cause to stop and detain him prior to that arrest. We review the controlling rules.

It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868].) Although each case must be decided on its own facts, certain standards for judging the lawfulness of the officer's conduct have emerged from our decisions. (See *People* v. *Harris* (1975) 15 Cal.3d 384, 388-389 [124 Cal.Rptr. 536, 540 P.2d 632]; *People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353]; *People* v. *Gale* (1973) 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204]; *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 426-427 [82 Cal.Rptr. 484, 462 P.2d 12]; *People* v. *Moore* (1968) 69 Cal.2d 674, 682-683 [72 Cal.Rptr. 800, 446 P.2d 800]; *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95-96 [41 Cal.Rptr. 290, 396 P.2d 706]; *People* v. *Mickelson* (1963) *supra*, 59 Cal.2d 448, 450-452; *People* v. *Simon* (1955) 45 Cal.2d 645, 650 [290 P.2d 531].)[1] The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution (Cal. Const., art. I, § 19; see *People* v. *Triggs* (1973) 8 Cal.3d 884, 891-892, fn. 5 [106 Cal.Rptr. 408, 506 P.2d 232]), is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 19 [20 L.Ed.2d at p. 904].) Because of the limited scope of that invasion in the present context, it need not be supported by the actual belief in guilt required to arrest, book, and jail an individual on a named criminal charge. (*People* v. *Harris, supra,* 15 Cal.3d at p. 389.)

[1]Beginning with the early matter of *Gisske* v. *Sanders* (1908) 9 Cal.App. 13, 16-17 [98 P. 43], the Courts of Appeal have also addressed the legality of temporary police detentions, but the cases are too numerous to list here. We note only two opinions, both authored by Justice Fleming, that have been particularly helpful in developing the rules of law governing this topic: *People* v. *Henze* (1967) 253 Cal.App.2d 986, 988-990 [61 Cal.Rptr. 545], and *People* v. *Manis* (1969) 268 Cal.App.2d 653, 658-666 [74 Cal.Rptr. 423].

Yet the interest at stake is far from insignificant: it is the right of every person to enjoy the use of public streets, buildings, parks, and other conveniences without unwarranted interference or harassment by agents of the law. (See, e.g., *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 815 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], and cases cited.) "A police officer may not use the authority of his uniform and badge to go around promiscuously bothering citizens." (*Batts* v. *Superior Court* (1972) 23 Cal.App.3d 435, 439 [100 Cal.Rptr. 181].)

■ Balancing these factors, the courts have concluded that in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience (*People* v. *Superior Court (Kiefer) supra,* 3 Cal.3d at p. 827), to suspect the same criminal activity and the same involvement by the person in question.[2] The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry* v. *Ohio, supra,* 392 U.S. at p. 22 [20 L.Ed.2d at pp. 906-907].)

The appellant herein also relies on language in *Irwin* to the effect that "Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful." (*Irwin* v. *Superior Court, supra,* 1 Cal.3d at p. 427.) Although some courts have invoked this language in invalidating a stop or detention (e.g., *People* v. *Evans* (1977) 65 Cal.App.3d 924, 931-932 [134 Cal.Rptr. 436]; *People* v. *Lathan* (1974) 38 Cal.App.3d 911, 918 [113 Cal.Rptr. 648]), a line of decisions beginning with *People* v. *Superior Court (Acosta)* (1971) 20

---

[2]In a trio of cases decided in 1972 this two-fold requirement of an *objective* verification of the reasonableness of a *subjective* state of mind was recognized and enforced in the context of probable cause to arrest. (*People* v. *Superior Court (Simon)* 7 Cal.3d 186, 198 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *Miller,* 7 Cal.3d 219, 226-227 [101 Cal.Rptr. 860, 496 P.2d 1228]; *Mestas* v. *Superior Court,* 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977].) The reasons there stated (see also *Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 28-32 [98 Cal.Rptr. 148]) are no less persuasive here, and the requirement must likewise be met. (See, e.g., *People* v. *Podesto* (1976) 62 Cal.App.3d 708, 718 [133 Cal.Rptr. 409].) *People* v. *Robles* (1972) 28 Cal.App.3d 739 [104 Cal.Rptr. 907], which held to the contrary on inadequate grounds, is disapproved.

Cal.App.3d 1085 [98 Cal.Rptr. 161], has sharply criticized the statement on various grounds and has declined to follow it as a rule of law. (See *People* v. *Moreno* (1977) 67 Cal.App.3d 962, 969 [134 Cal.Rptr. 322], and cases cited.) Upon analysis it appears the statement is not directly supported by the authorities cited in *Irwin* (1 Cal.3d at p. 427), and moreover was not necessary to the decision therein: Irwin's detention was based totally on a hunch, and the record permitted no reasonable suspicion whatever of criminal activity on his part. (*Id.,* at pp. 427-428.) His conduct "was not merely 'as consistent with innocent activity as with criminal activity,' it was only consistent with innocent activity." (*Barber* v. *Superior Court* (1973) 30 Cal.App.3d 326, 330 [106 Cal.Rptr. 304].) Nor has this court applied the *Irwin* dictum in any subsequent decision involving an investigative stop or detention; our sole references to it have been as examples—and therefore also dicta—in cases dealing with probable cause to arrest and search. (*People* v. *Triggs* (1973) *supra,* 8 Cal.3d 884, 895; *Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 664 [87 Cal.Rptr. 202, 470 P.2d 11]; see also *People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161].)

Reconsidering the matter, we are of the view that the *Irwin* dictum cannot be squared with the rule that a reasonable suspicion of involvement in criminal activity will justify a temporary stop or detention. Under that standard, if the circumstances are "consistent with criminal activity," they permit—even demand—an investigation: the public rightfully expects a police officer to inquire into such circumstances "in the proper discharge of the officer's duties." (*People* v. *Flores, supra,* 12 Cal.3d at p. 91.) No reason appears for a contrary result simply because the circumstances are also "consistent with lawful activity," as may often be the case. The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of his investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to "enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges." (*People* v. *Manis* (1969) *supra,* 268 Cal.App.2d 653, 665.) The citizen's undoubted interest in freedom from abuse of this procedure is protected —so far as it is within the law's power to do so—by the correlative rule that no stop or detention is permissible when the circumstances are not reasonably "consistent with criminal activity" and the investigation is therefore based on mere curiosity, rumor, or hunch. Because the *Irwin* dictum is thus in conflict with the settled standards for dealing with this sensitive problem, it is disapproved.

The Attorney General invokes yet another rule, contending that the intrusion here challenged was not a "stop" or "detention" but merely a "contact" and therefore required no justification at all. While there is no talismanic import in these terms, they are convenient labels for identifying a distinction that the courts have correctly recognized: "Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 13 [20 L.Ed.2d at p. 901].) Some of these encounters are subject to the foregoing rules, others are obviously not. The question, of course, is where to draw the line.

Again each case must be decided on its own facts, but certain guidelines have developed. It has been said that a detention occurs if the suspect is not free to leave at will—if he is kept in the officer's presence by physical restraint, threat of force, or assertion of authority. (See, e.g., *Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189, 197 [91 Cal.Rptr. 429].) But the definition is underinclusive: actual or threatened physical restraints are the characteristics of a full-blown arrest (Pen. Code, § 835), and an officer will frequently use more subtle methods to detain a suspect whom he wishes simply to question about possible criminal activity. The definition is also overinclusive: either through fear or respect, many persons who are not in fact under detention nevertheless do not feel free to leave at will when a uniformed police officer indicates a desire to talk with them.

A more fruitful approach focuses on the purpose of the intrusion itself. ▆ If the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated and he is entitled to the safeguards of the rules set forth above. But similar safeguards are not required if the officer acts for other proper reasons. Such reasons are obviously too many and varied to recite, but they may be grouped in at least two general categories: (1) the officer may wish to question the person not as a suspect but merely as a witness to a crime, or (2) the officer may be engaged in one of "those innumerable miscellaneous tasks which society calls upon police to do which have nothing to do with the detection of crime" (*Batts* v. *Superior Court* (1972) *supra,* 23 Cal.App.3d 435, 438), such as giving aid to persons in distress, mediating domestic quarrels, assisting the elderly or the disabled, furnishing traffic advice or

directions, and generally preserving the peace and protecting persons from harm or annoyance. (See *id.,* at pp. 438-439.)[3]

Applying these rules to the facts of the case at bar, we begin with the initial stop. The sole witness on the issue was Officer Thomas Joy of the California Highway Patrol. At 12:45 in the afternoon of Tuesday, February 10, 1976, he was on patrol in his police vehicle in a residential area of the City of La Puente, Los Angeles County. While proceeding north on Mayland Avenue he noticed Tony—a 13-year-old black youth—walking with another black youth along the sidewalk of Rath Street towards its intersection with Mayland. Officer Joy drove two blocks north on the latter street and made a U-turn. When he returned to the intersection Tony's companion was standing on the corner but the officer could not see Tony himself. Again Officer Joy drove past, went two blocks south to Ragus Street, made a left turn followed by another U-turn, and came back to Mayland. By this time the two youths were walking south along the sidewalk of Mayland and had almost reached Ragus. Without further surveillance Officer Joy pulled over, stopped the youths, and began questioning them as to their identities, their home addresses, and the purpose of their presence in the area.

Contrary to the Attorney General's contention, the officer's intrusion in these circumstances was more than a mere "contact" as just defined. At the hearing he did not claim that he desired to interview the two youths as witnesses to a crime, nor that they had appeared to be lost, in distress, or otherwise in need of his unsolicited assistance. Rather, when asked for his reasons for stopping the youths, he testified:

"Well, it was during school hours. They were both of school age. And they should have both been in school, number one.

"And number two, I'm very aware that juveniles do commit crimes when they're supposed to be in school and they're not."

The witness offered two other justifications in his testimony. He related that on the day before the incident he had learned informally that several burglaries had been reported in the Mayland-Rath area and "three male blacks" were being sought in connection therewith. And he added that

---

[3]By analogy to the rule in the case of warrantless arrests and searches (see *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23]), if the prosecution contends that a stop or detention was for a purpose other than to investigate the defendant as a suspect in criminal activity, it has the burden of proof on the issue.

when he drove past the Mayland-Rath intersection the second time and saw only Tony's companion, he "thought possibly" the latter was acting as a lookout while Tony was committing a burglary nearby.

We draw two conclusions from this testimony. First, it is clear the officers stopped Tony and his companion with the express purpose of investigating their possible involvement in criminal activity; accordingly, the legality of that stop must be judged by the rules reviewed hereinabove. Second, under those rules the stop was wholly unwarranted. There is nothing suspicious in the sight of two school children walking along the sidewalk during the noon hour: they may be going home for lunch, or on their way to a store, a playground, or a friend's house. Even if the encounter had taken place during the variety of present-day school hours, that fact would have had no sinister significance: it is not reasonable to suspect, as did Officer Joy, that any minor who is proceeding along a public street during school hours is ipso facto bent on committing crimes. Such speculation ignores the many circumstances in which a student may properly be away from school premises during classroom hours—e.g., on an errand for a school official, going to a doctor's or dentist's appointment, in transit to an athletic event, or returning home because of injury or illness. Even if the absence were unauthorized, Officer Joy's theory would treat every minor truant as a suspected thief, burglar, or worse; yet the prosecution made no attempt to prove, by statistics or otherwise, the validity of so startling an inference.[4]

Nor did the situation become suspicious simply because Officer Joy had been told that several burglaries had occurred in the neighborhood. It is true that a number of decisions have given weight to the fact that the stop or detention took place in a "high crime area." (See, e.g., *Flores* v. *Superior Court* (1971) 17 Cal.App.3d 219, 223 [94 Cal.Rptr. 496].) But the justification is so easily subject to abuse that this fact alone should not be deemed sufficient to support the intrusion. A day-old burglary report does not transform a residential neighborhood into a no man's land in which any passerby is fair game for a roving police interrogation: "To hold that police officers should in the proper discharge of their duties detain and question all persons in that location . . . would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street." (*People* v. *Moore* (1968) *supra,* 69 Cal.2d 674, 683; accord, *Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 357 & fn. 1 [85 Cal.Rptr. 160, 466 P.2d 704].)

---

[4]Officer Joy himself was not a truant officer but a highway patrolman, and established no expertise in the field of juvenile delinquency.

Moreover, in the case at bar Officer Joy had been informed only that the suspects in the prior burglaries were "three male blacks" of unspecified ages. Such a vague description could not reasonably have led him to suspect these *two* black *minors* were the missing culprits.[5] To hold otherwise would authorize the police to stop and question every black male, young or old, in an area in which a few black suspects were being sought. Such wholesale intrusion into the privacy of a significant portion of our citizenry would be both socially intolerable and constitutionally impermissible.[6]

Finally, nothing is added to the equation by the fact that Tony and his companion appeared to briefly part company during Officer Joy's surveillance of their movements. In the circumstances it was highly unlikely the two youths were then in the act of committing a burglary: a marked police car had just driven across their field of vision, the car returned a few moments later, and Tony's companion exhibited no reported signs of nervousness or concern at its sudden reappearance. Much more is needed to reasonably suspect that a person merely standing on a street corner in broad daylight is acting as a "lookout" for a partner in crime.

In short, viewed either singly or collectively the circumstances known to Officer Joy did not support a reasonable suspicion that Tony and his companion were involved in criminal activity when he observed them walking along the sidewalk. Rather, as the officer testified with regard to his "lookout" theory, at most he "thought possibly" that the two youths might have been engaged in some kind of larcenous conduct. The ensuing investigative stop was thus based entirely on a combination of hunch and curiosity, and hence was no less unlawful than the intrusions we condemned in *Irwin, Moore,* and *One 1960 Cadillac Coupe.*

---

[5]Compare the detailed descriptions that we held, with additional circumstances, justified an investigative stop in *People* v. *Harris, supra,* 15 Cal.3d at page 387 ("male Caucasian, dark hair, moustache, about 5 feet 8 inches tall, about 150 pounds, wearing a light cardigan sweater and dark trousers") and in *People* v. *Flores, supra,* 12 Cal.3d at page 89 (two Mexican-Americans wearing dark clothing and wide-brimmed hats, each from 5 feet 8 inches to 5 feet 9 inches tall, weighing 160 to 165 pounds and driving a dark-colored General Motors "fastback" sedan of mid-1940's vintage).

[6]We note Officer Joy did not claim at the hearing that his suspicions were aroused merely because of the fact that both youths were black. The assertion would have been refuted, moreover, by his own admission on cross-examination that the resident population of the neighborhood in question was a mixture of blacks, whites, and Mexican-Americans.

Because the initial stop was improper, we need not reach Tony's contention that his rights were again violated when, after several minutes of questioning, he and his companion were detained for an additional five to ten minutes while a deputy sheriff drove to the scene for further investigation in response to a radio call by Officer Joy. Upon arrival the deputy sheriff recognized Tony's name and arrested him on an outstanding charge, and in the subsequent booking search certain property found on his person was determined to have been stolen in a burglary earlier the same day. The offense alleged in petition "A" was the receipt of that property. (Pen. Code, § 496.)

It follows that the evidence against Tony was the direct product of exploitation of the unlawful investigative stop, and should have been suppressed. A timely motion to that effect was made and denied. Because there was no legally admissible evidence to support the order adjudging him a ward of the juvenile court under petition "A," the order must be reversed. (Welf. & Inst. Code, § 701; see *In re Michael V.* (1974) 10 Cal.3d 676, 680-681 [111 Cal.Rptr. 681, 517 P.2d 1145].)

### *Petition "C"*

Tony does not deny that he committed the offense alleged in petition "C," i.e., rape by threat of great bodily harm. (Pen. Code, § 261, subd. 3.) His contentions relate instead to the proof of his capacity (1) to commit the crime and (2) to appreciate its wrongfulness. We begin with the latter point.

Penal Code section 26, subdivision One, declares that minors under the age of 14 are presumed incapable of committing a crime in the absence of "clear proof" that at the time of the act "they knew its wrongfulness." *In re Gladys R.* (1970) 1 Cal.3d 855, 862-867 [83 Cal.Rptr. 671, 464 P.2d 127], held this rule applicable in proceedings under Welfare and Institutions Code section 602 to declare a minor a ward of the juvenile court by reason of his violation of a law.

In the case at bar Tony's mother testified at the hearing on petition "A" with regard to his knowledge of the wrongfulness of taking another's property without permission. Several weeks later the same juvenile court referee conducted the hearing on petition "C," and Tony's mother testified as to her son's knowledge of the wrongfulness of having forcible sexual intercourse with another person. At the close of the hearing the

referee said, "Between the testimony of the mother at this time and the latter time on the *Gladys R.* issue, I think the burden has been met."

■ Tony contends that by taking judicial notice of his mother's testimony at the prior hearing the referee erroneously relied at least in part on hearsay evidence in ruling on petition "C." (Evid. Code, § 1200.) We agree. Contrary to the Attorney General's claim, the referee's finding on the *Gladys R.* issue on petition "A" was not res judicata on petition "C" because the elements of the two crimes are different: a minor may know it is wrong to steal without also knowing it is wrong to engage in conduct that the law denominates as rape.

On the record of this case, however, the error was not prejudicial. For the reason just stated, the challenged hearsay testimony was essentially irrelevant to the *Gladys R.* issue under petition "C." Moreover, evidence properly admitted at the hearing on the latter petition amply demonstrated that at the time of committing the rape Tony had full knowledge of its wrongfulness.

■ It would manifestly frustrate the intent of Penal Code section 26 to infer such knowledge from the bare commission of the act itself. Yet for this purpose reference may properly be made to the attendant circumstances of the crime, such as its preparation, the particular method of its commission, and its concealment. Reliance on circumstantial evidence is often inevitable when, as here, the issue is a state of mind such as knowledge. (See, e.g., *Landeros* v. *Flood* (1976) 17 Cal.3d 399, 415, fn. 13 [131 Cal.Rptr. 69, 551 P.2d 389].) We recognized as much in *Gladys R.* when we concluded that a minor under 14 can be declared a ward on this ground only if his "age. experience, knowledge, and conduct" clearly prove his awareness that he had violated a criminal law. (1 Cal.3d at p. 867.)

Such evidence was introduced in the case at bar. At the time of committing the rape Tony was only eight weeks short of his fourteenth birthday.[7] The victim, an 18-year-old married woman, was walking along the sidewalk of a large, four-lane street at 8 o'clock in the evening. Tony seized her from behind, thrust a knife with a six- to eight-inch blade against her neck, and pushed her up against a wall. Keeping his arm around her shoulder and the knife against her neck, he then compelled

---

[7] In *Gladys R.* the minor was 12 years old but had "the social and mental age of a 7-year-old." (1 Cal.3d at p. 867.) (See also *In re Michael B.* (1975) 44 Cal.App.3d 443 [118 Cal.Rptr. 685] (nine-year-old boy).)

her to walk about half a block with him and turn into a small dead-end street. There he made her climb over a fence into the yard of a residence and lie down. Still holding the knife at her throat, he lay on top of her, forcibly pulled down her pants and underclothing, and entered her with his penis. After several minutes of intercourse he climaxed and withdrew. As he got up he asked her if she was going to call the police. He then took some money from her purse, climbed back over the fence, and ran off.

The facts are uncontradicted, and their implications are equally plain. Tony's constant use of the threat of deadly force demonstrates that he knew his victim would not submit to sexual intercourse without being exposed to great bodily harm. His conduct in taking her to a secluded location behind a fence on a dead-end street shows he was aware that he had to accomplish his intended deed in private in order to minimize the risk of detection and punishment. And his act of asking his victim if she intended to call the police, followed by his flight from the scene, manifested both knowledge of illegality and consciousness of guilt. Taken together, these facts constitute clear—even overwhelming—proof that throughout the attack Tony well knew the wrongfulness of his conduct within the meaning of Penal Code section 26.

■ Finally, Tony contends that his "physical ability to accomplish penetration" was not "proved as an independent fact, and beyond a reasonable doubt," as required by Penal Code section 262.[8] In the 106 years since section 262 was enacted, no reported decision discussed the method of complying with this statute, i.e., how the fact in issue was to be made the subject of "independent" proof. As to all future cases the question is now moot: on March 9, 1978, the Governor signed into law an urgency measure, passed unanimously by both houses of the Legislature, repealing section 262. (Stats. 1978, ch. 29, § 1.) We therefore briefly address the matter for the purpose of this appeal only.

The requirement of former section 262 that the minor's physical capacity be "proved as an independent fact" meant, we believe, that it be proved independently of the testimony of the rape victim that he committed the crime. But as we hold above in construing section 26, the requirement did not prevent persuasive inferences from being drawn from the attendant circumstances of the crime. In the case at bar the victim was examined by a physician at a hospital shortly after the rape.

---

[8]"No conviction for rape can be had against one who was under the age of fourteen years at the time of the act alleged, unless his physical ability to accomplish penetration is proved as an independent fact, and beyond a reasonable doubt."

Vaginal smears were taken, and chemical analysis thereof showed the presence of seminal fluid and sperm not more than six hours old. The rape victim had not had sexual relations with any person other than Tony during the 16-hour period preceding the examination. The obvious inference from this evidence is that at the time of the attack Tony had the "physical ability to accomplish penetration." No more was required to satisfy former section 262.

The order sustaining petition "A" is reversed; the order sustaining petition "C" is affirmed.

Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—Today, this court takes Fourth Amendment law one step forward, two steps backward, and one step sideways. In attempting to illuminate and refine the contours of the constitutional standards relating to temporary detentions, confusion and uncertainty are created instead of the clarity essential to achieve compliance with the goals of the Fourth Amendment.[1] The majority opinion opens the way for a foreseeable trampling of the fundamental "right to be let alone—the most comprehensive of rights and the right most valued by civilized men." (*Olmstead* v. *United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 66 A.L.R. 376] [dis. opn. by Brandeis, J.].)

The Fourth Amendment is not a "kind of nuisance, a serious impediment in the war against crime" nor "an outworn bit of Eighteenth Century romantic rationalism but an indispensible need for a democratic society," the abuse of which "more than any one single factor gave rise to American independence." (*Harris* v. *United States* (1947) 331 U.S. 145, 157, 159, 161 [91 L.Ed. 1399, 1409, 1410, 1411, 67 S.Ct. 1098] [dis. opn. by Frankfurter, J.].) "Among deprivation of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to

[1]Unless otherwise specified, the phrase "Fourth Amendment" in this opinion refers to both the state and federal guarantees against unreasonable seizures and searches. (See *People v. Triggs* (1973) 8 Cal.3d 884, 891-892, fn. 5 [106 Cal.Rptr. 408, 506 P.2d 232].)

know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police." (*Brinegar* v. *United States* (1949) 338 U.S. 160, 180-181 [93 L.Ed. 1879, 1893, 69 S.Ct. 1302] [dis. opn. by Jackson, J.].) Thus, in determining the range and depth of the Fourth Amendment guarantees, courts must be aware that "in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." (*Spano* v. *New York* (1959) 360 U.S. 315, 320-321 [3 L.Ed.2d 1265, 1270, 79 S.Ct. 1202].)

The Fourth Amendment commands the government to respect the collective security of the people "in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." In the first and most important instance the Fourth Amendment speaks to the state's police officers. (See Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 367-372.) If the police are to comply, they must be able to understand what the Fourth Amendment demands of them. The courts interpret these demands by articulating Fourth Amendment "rule[s] governing police conduct." (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 452 [30 Cal.Rptr. 18, 380 P.2d 658].) But if the police are to conform to these rules in concrete situations, the rules must be *clear*. The police officer in the field must be able to determine with some certainty, before he or she acts, whether or not the invasion of privacy is justified under the Constitution.

Detention decisions normally arise when an officer is confronted by a spontaneous, fast-changing situation. Often, if action is to be taken, it necessitates quick, sometimes immediate, action on the part of the officer. If the officer is to be controlled by the Fourth Amendment in making a detention decision, the courts cannot realistically direct the officer to engage in a sensitive ad hoc balancing test nor in a sliding scale analysis that matches multiple categories of intrusions with corresponding levels of sufficiency of proof. Such mental exercises "may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.'" (LaFave, *"Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma* (1974) Sup.Ct.Rev. 127, 141.) (Citation omitted.)

A police officer will be afforded little assistance in his or her detention decision by an open-ended general standard, such as "reasonableness,"

which "is obviously much too amorphous either to guide or regulate the police." (Amsterdam, *op. cit. supra,* 58 Minn.L.Rev. at pp. 414-415; cf., *post,* at pp. 905-907.) As commands or controls on police officers, these types of rules are "splendid in [their] flexibility, [but] awful in [their] unintelligibility, unadministrability, enforcibility and general ooziness." (Amsterdam, *op. cit. supra,* at p. 415.)

It is true that the complexities of life do not lend themselves to a discipline of "clear" rules, but this court must take care that the rules it sets forth are at least fairly clear. Vague, highly debatable or intensely sophisticated directives are of no value in settings where concrete decisions must be made without the possibility of prolonged contemplation or foreknowledge of a specific situation. When a court chooses to articulate open-ended rules for use in such settings, it chooses unworkable rules that will be applied unevenly and honored only in their breach.

In the present case, this court must decide whether a "detention" occurred within the meaning of the Fourth Amendment. The gravity of this question cannot be minimized for there are "few issues more important to a society than the amount of power that it permits its police to use without effective control by law." (Amsterdam, *op. cit. supra,* 58 Minn.L.Rev. at p. 377.) If certain police activity does not amount to a "detention," then that activity is not scrutinized by the courts since it is not controlled by the Fourth Amendment. (*Id.,* at p. 388.) In holding that certain activity rises to the level of a "detention," the courts merely hold that the activity is subject to legal scrutiny in light of the Fourth Amendment's command of reasonableness.

I agree with the holding of the majority that there was a detention in the present case. The reasons advanced for this holding are sound and advance Fourth Amendment law. The current definition of a detention is expanded to cover any occasion where an officer personally contacts an individual whom the officer suspects may be involved in some criminal activity. (Maj. opn., *ante,* at p. 895.) This sort of interaction between officer and citizen is what the Fourth Amendment sought to control. While the majority's language overlaps to a large extent the pre-existing detention tests, which remain intact,[2] it covers in a clear and concise fashion some

---

[2] See, e.g., *Terry* v. *Ohio* (1968) 392 U.S. 1, 19, footnote 16 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868]; *United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 878 [45 L.Ed.2d 607, 614-615, 95 S.Ct. 2574]; *People* v. *Moore* (1968) 69 Cal.2d 674, 678, 683 [72 Cal.Rptr. 800, 446 P.2d 800] (It was "clear" that the officer made a detention when he "went to the telephone booth [the defendant was using], and asked defendant his name and several questions.").

situations where other courts have had difficulty. (See, e.g., *People* v. *Larkin* (1975) 52 Cal.App.3d 346, 349 [125 Cal.Rptr. 137]; *Batts* v. *Superior Court* (1972) 23 Cal.App.3d 435, 439 [100 Cal.Rptr. 181]; *People* v. *Blackmon* (1969) 276 Cal.App.2d 346, 349 [80 Cal.Rptr. 862].) The majority's test will be easy for the courts to employ and simple for the police to apply in the field. For example, if an officer accosts an individual with any idea the individual might be involved in criminal activity, the officer knows his or her conduct will be subject to the rules on detention. Thus, the majority opinion not only applies the Fourth Amendment in a context where it clearly should, but it does so in a fashion capable of application in concrete day to day situations.

The same comment cannot be made concerning the majority's determination of the legality of a detention based upon "suspicious circumstances." Prior to today's holding, this court had held that "[t]here must be a 'rational suspicion by the peace officer that some activity out of the ordinary is or has taken place . . . some indication to connect the person under suspicion with the unusual activity. . . . [and] some suggestion that the activity is related to crime.' [Citation.] Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful." (*Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12].)

The first sentence of this holding in *Irwin* identified the three elements that must exist in order to constitute "suspicious circumstances." The second sentence articulated the amount of evidence that was necessary to make a detention based on "suspicious circumstances" reasonable. *Both* sentences were necessary so that the police, acting in detention situations in the field, could accurately adhere to the commands of the Fourth Amendment. Neither one standing alone would adequately guide an officer's detention decision. For example, omitting the second sentence while using only the first would be analogous to instructing a jury in a criminal case on the elements of the offense but failing to instruct on the standard of proof.

The second sentence of the *Irwin* formulation is disapproved by the majority but nothing is advanced to replace it with another rule of comparable clarity. Instead, conclusionary labels are suggested. If the suspicious circumstances are equivalent to "mere curiosity, rumor, or hunch," a detention based thereon would be impermissible. (Maj. opn., *ante*, at p. 893.) If the circumstances constitute "a reasonable suspicion of involvement in criminal activity," a detention would be lawful. (Maj.

opn., *ante,* at p. 894.) But how can an officer acting in the field determine whether the specific circumstances he or she observes are in Fourth Amendment terms a "reasonable suspicion" rather than a "mere hunch?" No clue is provided by the majority except that the officer should be "objectively reasonable." (Maj. opn., *ante,* at p. 894.) At best such a standard is woefully lacking in precision and has no place in a set of rules which are "calculated to prevent, not to repair" transgressions against the Fourth Amendment. (*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677-1678, 80 S.Ct. 1437].)

A command to "be reasonable" affords an officer no specific guidance to deal with a specific situation. "Reasonableness" calls on each individual to look primarily to his or her own set of values or personal sense of equities to determine what is proper. What is "reasonable" to one person may be unreasonable, unjustified, arbitrary, or outrageous to another. Under a regime of "reasonableness," our populace's freedom from unwarranted police detention will depend more upon the personalities or moods of the police patrolling an area than upon our state or federal Constitutions. Moreover, since judges must employ the same nebulous "reasonableness" rule as police officers, no meaningful clarification as to their duties will result from judges' rulings on motions to suppress evidence.

If this rule is adopted, it will lead to uncertainty over whether the sanction of exclusion of evidence will be applied. This will have a deleterious effect upon the Fourth Amendment since control over the police's behavior will be reduced. (See Kennedy, *Form and Substance in Private Law Adjudication* (1976) 89 Harv.L.Rev. 1685, 1696.) The police will be encouraged to make detentions in the hope that some trial or appellate judge can be found who will hold the detention "reasonable." Such seize-now-justify-later behavior has been repeatedly condemned as inimical to the "basic purpose" of the Fourth Amendment. (*People* v. *Miller* (1972) 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228]; see also, e.g., *Mestas* v. *Superior Court* (1972) 7 Cal.3d 537, 542 [102 Cal.Rptr. 729, 498 P.2d 977].)

Further, vagueness and uncertainty will tend to discourage officers from becoming proficient in Fourth Amendment law. "[U]ncertainty reduces the incentive to find out the nature of one's duties . . . ," since the reward from such proficiency is unpredictable. (Kennedy, *op. cit. supra,* at pp. 1698-1699.) Although an understanding by the police of Fourth Amendment rules is essential for the success of these rules (cf., *ante,* at

pp. 903-904), the use of an imprecise general standard such as "reasonableness" decreases the ability of the police to acquire that understanding.

A "reasonableness" standard is, therefore, self-defeating. In providing no clear guidance to the police, this court's holding will lead at best to the uneven and sporadic application of the fundamental rules of our society.

The *Irwin* rule that a detention may not occur unless the circumstances are more consistent with criminal activity than innocent activity, speaks directly "in terms of how much evidence is needed for certain [police] actions. . . ." (LaFave, *"Street Encounters" and the Constitution: Terry, Sibron, Peters and Beyond* (1968) 67 Mich.L.Rev. 39, 52, fn. 63.) This is imperative if the police "are to have a clear understanding of their authority. . . ." (*Ibid.*) *Irwin* affords guidance to police in the field trying to evaluate "suspicious circumstances." When such guidance is provided, the police will be capable of conforming their conduct to the requirements of the Fourth Amendment.[3]

Some decisions of the Court of Appeal have stated that the *Irwin* rule improperly equates the standard for detention with the standard for arrest. (E.g., *People* v. *Moreno* (1977) 67 Cal.App.3d 962, 967 [134 Cal.Rptr. 322]; *People* v. *Superior Court (Acosta)* (1971) 20 Cal.App.3d 1085, 1089 [98 Cal.Rptr. 161].) However, these cases misconstrue the *Irwin* test. To justify an arrest, the facts must "lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of *a crime."* (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577].) (Italics added.) In short, there must be probable cause to believe the suspect has committed or is committing *a particular crime.* However, to justify a detention, there must merely be probable cause to believe the suspect *is engaging, has engaged, or will engage in general "criminal activity."* (*Irwin v. Superior Court, supra,* 1 Cal.3d at p. 427.) (Italics added.)

The difference between the showing necessary for an arrest and that for a detention based on suspicious circumstances lies *not* in the amount of proof needed to sustain the act but in the "elements" required. An arrest requires probable cause to believe a *specific crime* has been committed. A

---

[3]Of course, people, including judges and police officers, will differ in some cases over whether the particular facts are more consistent with innocent activity than with criminal activity. However, the differences will occur less frequently and the arguments will be much more focused than if a general "reasonableness" standard is used. At least, the parties will know what the question is. A debate over "reasonableness" all too often consists of nothing more than "Yes it is" and "No it isn't."

detention requires a lesser showing of probable cause to believe *nonspecific criminal activity* is afoot (i.e., unusual activity related to crime [see *ante,* at p. 905]). This difference was clearly articulated in a post-*Mickelson* decision by this court. "There are, in fact, two determinations of probable cause which we are called upon to make in the instant case: (1) did the officer have *probable cause to detain* [the suspect] for questioning when they first approached him, and (2) if so, did the officers have *probable cause* based on knowledge thus lawfully obtained *when they searched him?*" (*People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95 [41 Cal.Rptr. 290, 396 P.2d 706].) (Italics added.)

The vagueness of the majority's standard for detentions is illustrated by the fact that the *result* of today's decision is patently inconsistent with the *results* of most of the cases it cites with approval for their criticism of the *Irwin* test. Consider three of those cases. In *People* v. *Moreno, supra,* a man was driving a car at 7 p.m. on a public road in a commercial area, one and one-half blocks from where the road became a private road leading to a sportsman's club a mile away. There had been six thefts or burglaries within a mile radius of that location during the prior year. In *People* v. *Larkin, supra,* a woman stood talking to several known heroin users in front of a pool hall in a high crime area. When a police car circled by for the second time, the officers saw the woman enter the pool hall with one other person. In *People* v. *Higbee* (1974) 37 Cal.App.3d 944 [112 Cal.Rptr. 690] a man sat in front of a residence in a high crime area for two minutes, with his motorcycle engine running. In all three cases, the Courts of Appeal sustained detentions based upon these meager showings.

In the present appeal, two minors were walking during school hours down a public street in a "high crime area." One of the two disappeared for a short time, while the other stood on a street corner. A passing police officer, who was looking for "three black males" in connection with recent burglaries in the area, noted both minors were black. The majority quite properly holds this showing insufficient to justify a detention either for suspicious circumstances or for investigation of the recent burglaries. Surely, any officer who had read *Moreno, Larkin* and *Higbee* would probably have concluded the detention in the present case was proper. Today's result would not justify future reliance on those decisions. The extent to which other decisions in this line have continuing validity

remains debatable, depending upon one's view of their "reasonableness."[4]

The *Irwin* rule was good law because it was clear and concise. It was not a departure from the settled law of this court.[5] Since it was far more useful in the concrete situations the police face in their encounters with our citizens, *Irwin* should not be replaced by a general standard that is at once unclear and imprecise. Today's decision ensures that we will have a Fourth Amendment "with all of the character and consistency of a Rorschach blot."[6]

---

[4]It is certainly a telling criticism of the majority's standard that even in the comparatively calm atmosphere of appellate courts, it leads so easily to inconsistent or incorrect results.

[5]It has been suggested that *Irwin* was overruled *sub silentio* by this court's opinions in *People* v. *Flores* (1974) 12 Cal.3d 85 [115 Cal.Rptr. 225, 524 P.2d 353] and *People* v. *Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632]. (See *People* v. *Moreno, supra*, 67 Cal.App.3d at pp. 968-969; *People* v. *Knutson* (1976) 60 Cal.App.3d 856, 862 [131 Cal.Rptr. 846]; *People* v. *Larkin, supra*, 52 Cal.App.3d at p. 349; *People* v. *Rios* (1975) 51 Cal.App.3d 1008, 1011 [124 Cal.Rptr. 737]; *People* v. *Higbee, supra*, 37 Cal.App.3d at p. 950.)

This suggestion ignores the fact that neither *Flores* nor *Harris* involved detentions based upon observed "suspicious circumstances," as was the case in *Irwin*. Rather, the suspects in the two former decisions were detained because of their resemblance to particular suspects in prior known crimes. In such a situation it is unnecessary for an officer to observe the suspect engaged in suspicious activity at the time of detention. Indeed, in most such instances, the suspect will be engaged in no unusual activity when detained, but detention may nevertheless be proper for other reasons.

It was thus unnecessary for the court in *Flores* or *Harris* to discuss the suspicious circumstances rules of *Irwin*. Failure to do so indicates this court's awareness of the different settings of the cases (see Tiffany, et el., Detection of Crime (1967) pp. 19, 34), rather than any disapproval of *Irwin*.

[6]Amsterdam, *op. cit. supra*, at page 375.