Filed 1/6/14  P. v. Patel CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039130 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1227579) |
| v. | |
| SANGAM RAMESH PATEL, | |
| Defendant and Appellant. | |

Pursuant to a negotiated plea agreement, defendant Sangam Ramesh Patel pleaded no contest to possession of ephedrine or pseudoephedrine with intent to manufacture methamphetamine (Health & Saf. Code, § 11383.5, subd. (b)(1)).  The trial court suspended imposition of sentence and placed defendant on probation for three years on condition, among other things, that he serve one year in jail.  On appeal, defendant contends that the trial court erred when it denied his motion to suppress evidence.  We agree and reverse.

## I.  Statement of Facts

### A.  Prosecution Evidence

At approximately 5:30 p.m. on January 12, 2010, Officer Jason Vincent was patrolling the lot of the E-Z 8 Motel at 1515 North First Street in San Jose.  During his

shift, he patrolled this parking lot at least once a day due to its reputation for narcotics use and other vice crimes. Vincent noticed a dark-colored sedan with a leg protruding from the driver's side door. He continued patrolling the parking lot and returned to the sedan at about 5:34 p.m. The door was now closed and Vincent could see the driver through the driver's side window. He could not see through the back window because there was condensation on it. Vincent did not think that anything illegal had occurred, was occurring, or was about to occur. However, he thought that being parked at the E-Z 8 Motel for an extended period was suspicious.

Vincent positioned his patrol car at a slight angle approximately 10 feet behind the sedan. He then exited his patrol car and stood behind its driver's side door. At some point, he activated the spotlight on the sedan. After Vincent said "hello" in a raised voice to allow the sedan's occupants to hear him, defendant exited the front passenger's side of the sedan.

Vincent asked defendant to come to his location, which he did. At that time, Vincent knew that there was at least one other person in the sedan. Vincent asked defendant whether he had a weapon or anything illegal on him, and defendant said that he did not. When Vincent asked for defendant's identification, defendant gave him his driver's license. In response to Vincent's questioning, defendant said that Romel Lindsay, his business partner, was sitting in the driver's seat and Lindsay's female friend was sitting in the back seat. Defendant also told Vincent that he had been resting in the car and that they were at the motel to meet a friend to conduct business regarding "V.O.I.P. telephones." Vincent pat searched defendant, but he did not find anything. Vincent verified that defendant's identification was accurate. According to Vincent, defendant was not free to leave at that time. Vincent told defendant to lean against his patrol car with his hands where Vincent could see them.

After speaking to defendant, Vincent asked Lindsay to get out of the car. Lindsay told Vincent his name and date of birth, and Vincent contacted dispatch to conduct a

2

records check. While waiting for a response from dispatch, Vincent questioned Lindsay about the female passenger. Lindsay told Vincent that the woman's name was Justine. At about 5:46 p.m., Vincent was notified that there was an arrest warrant for Lindsay. Vincent placed Lindsay under arrest and put him in the back seat of his patrol car. Vincent completed questioning Lindsay about 12 minutes after his initial contact with defendant.

After placing Lindsay in his patrol car, Vincent asked the woman, who was sitting in the back seat on the driver's side, to exit the sedan. The woman told Vincent that she did not have her identification with her, her name was Justine Elecho, and her date of birth was May 13, 1964. Vincent provided this information to dispatch at about 5:50 p.m. When Vincent told the woman that dispatch was unable to locate anyone with her name and date of birth in the records system, she told him that her name was Justine Evangelista and her date of birth was May 12, 1966. Evangelista explained that she initially gave him a different name and date of birth because she was on parole. Dispatch confirmed that Evangelista was on parole. At 6:08 p.m., other officers arrived on the scene.

Sometime between 6:08 p.m. and 6:15 p.m., Vincent searched Evangelista and found a small white plastic baggie that contained a white crystal-like substance in her pocket. The officer recognized the substance as methamphetamine. In response to Vincent's questioning, Evangelista told him that she had used methamphetamine approximately two days earlier and her backpack was on the back seat. Vincent located the backpack, searched it, and found another plastic baggie containing a substance which he recognized as methamphetamine. He also found mail and several credit cards that were not in the names of any of the occupants of the sedan.

After searching Evangelista's backpack in the car, Vincent noticed a large quantity of white pills in foil packaging in the front driver's side door compartment. According to Vincent, these pills were the type of nasal decongestant which contain pseudoephedrine,

3

and pseudoephedrine is one of the ingredients in the production of methamphetamine. Vincent continued searching the car and found a digital scale that had white residue on it. The scale was between the front driver's seat and the center console and was adjacent to where Evangelista had been sitting. Vincent also found a second bag in the back seat. The bag contained a laptop computer, multiple receipts for purchases of nasal-decongestant pills, documentation of pill prices, and coupons for pills. Vincent asked defendant if the bag belonged to him or to Evangelista. After defendant replied that it belonged to him, he was arrested.

### B. Defense Evidence

Defendant testified that he, Lindsay, and Evangelista were sitting in his mother's Honda Accord in the parking lot of the E-Z 8 Motel when a bright spotlight shined on the car from behind. A voice from a megaphone or P.A. system said, "Hello. Can the person in the black vehicle please step out of the vehicle." Defendant described the tone of the voice as "authoritative." As defendant stepped out of the car, the voice said, "Stop. Take your hands out of your pockets and put them where I can see them." Defendant complied.

Defendant saw a police officer standing behind the door of his patrol car, which was about three feet from the rear bumper of the sedan. The officer said in an authoritative tone, "Step towards me." After defendant complied, the officer asked him what he was doing there, whether he had any weapons or anything harmful in the vehicle, and who he was with. The officer also asked to see defendant's driver's license and if he had weapons or dangerous items on him. When defendant said that he had no weapons, the officer pat searched him and searched his pockets. Nothing illegal was found. The officer then asked defendant to lean against the patrol car with his hands on the car and his buttocks on his hands. The officer entered his patrol car to check defendant's driver's license.

4

About 10 minutes later, the officer returned defendant's driver's license. Defendant asked if he was free to go and the officer said, "Hang on," and asked more questions about what he was doing in the parking lot and who else was in the car. The officer then had defendant sit in the back seat of his patrol car before he asked Lindsay to exit the sedan. The officer pat searched Lindsay and eventually placed him in handcuffs. After the officer finished questioning Evangelista, he asked defendant, "If we looked into your vehicle, would we find any kind of weapons or anything illegal?" Defendant said, "No," and the officers searched his car. They never asked for his consent.

## C. The Trial Court's Ruling

Following argument, the trial court stated: "There is no question that the officer unlawfully conducted the detention and lacked reasonable suspicion. However, we have to look to see whether or not there were attenuating factors. [¶] As [the prosecutor] pointed out, the exclusionary rules purpose is to deter police misconduct, and that's not applicable in this case. Here, the officer's knowledge of Ms. Evangelista's parole condition before the search, I am satisfied, did dissipate any taint that might have flown from the detention of Mr. Patel. And the court is making that finding applying the factors used by the Brendlin court and the Durant court." The trial court then denied the motion to suppress evidence.

## II. Discussion

Defendant contends that the trial court erred when it denied his motion to suppress evidence.

" 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our

independent judgment. [Citations.]'" (*People v. Weaver* (2001) 26 Cal.4th 876, 924 (*Weaver*), quoting *People v. Glaser* (1995) 11 Cal.4th 354, 362.)

The Fourth Amendment, made applicable to the states through the due process clause of the Fourteenth Amendment, protects the individual against unreasonable searches and seizures. (*Mapp v. Ohio* (1961) 367 U.S. 643, 656-660.) When a police officer engages in conduct that violates the Fourth Amendment, the evidence obtained through such conduct is subject to the exclusionary rule. (*People v. Mayfield* (1997) 14 Cal.4th 668, 760.)

The protection of the Fourth Amendment extends to brief investigatory stops that fall short of an arrest. (*Terry v. Ohio* (1968) 392 U.S. 1, 16-17.) "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity." (*In re Tony C.* (1978) 21 Cal.3d 888, 893, superseded on other grounds by Cal. Const., art. I, § 28.)

Here, it is undisputed that Vincent's detention of defendant was unreasonable under the Fourth Amendment. Vincent's testimony did not include "specific and articulable facts" that caused him to suspect that criminal activity had occurred, was occurring, or about to occur, and that defendant was involved in that activity. (*In re Tony C.*, *supra*, 21 Cal.3d at p. 893.)

As did the trial court, we turn to *People v. Brendlin* (2008) 45 Cal.4th 262 (*Brendlin*) and *People v. Durant* (2012) 205 Cal.App.4th 57 (*Durant*) to determine whether the evidence in the present case must be suppressed.

In *Brendlin*, *supra*, 45 Cal.4th 262, the officer stopped a vehicle with an expired registration sticker after he confirmed that the vehicle's registration had expired. (*Id.* at p. 265.) However, prior to the stop, the officer was informed that a renewal application was "'in process,'" and he had observed a temporary operating permit on the vehicle.

6

(*Ibid.*) In the officer's experience, temporary operating permits sometimes were falsified or belonged to a different vehicle. (*Id.* at p. 271.) The officer asked for the identification of both the driver and the defendant, a passenger. (*Id.* at pp. 265-266.) He then verified that the defendant was on parole and there was a warrant for his arrest. (*Id.* at p. 266.) During the search of the defendant and the vehicle, officers found marijuana, methamphetamine, and drug paraphernalia. (*Ibid.*) It was undisputed that the defendant was unlawfully seized when the officer made the traffic stop. (*Id.* at p. 268.)

However, in determining whether the evidence should have been suppressed *Brendlin* began its analysis by observing: " ' " '[N]ot . . . all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " ' " [Citations.] '[B]ut-for cause, or "causation in the logical sense alone," [citation] can be too attenuated to justify exclusion . . . . ' [Citations.]" (*Brendlin*, *supra*, 45 Cal.4th at p. 268.)

In answering the question whether an intervening circumstance was sufficient to break the causal connection between the illegal stop and the search, *Brendlin* considered the three factors set forth in *Brown v. Illinois* (1975) 422 U.S. 590. (*Id.* at p. 269.) These factors are: " ' "the temporal proximity of the Fourth Amendment violation to the procurement of the challenged evidence, the presence of intervening circumstances, and the flagrancy of the official misconduct.' [Citations.]" (*Ibid.*)

*Brendlin* first noted that there were "only a few minutes" between the unlawful traffic stop and the search incident to the arrest, and recognized that there was a split of authority as to the relevancy of this factor. (*Brendlin*, *supra*, 45 Cal.4th at p. 270.) *Brendlin* did not decide which line of authority was correct because it concluded that this factor was outweighed by the other factors. (*Ibid.*) *Brendlin* next reasoned that the

7

existence of a valid outstanding warrant "is an intervening circumstance that tends to dissipate the taint caused by an illegal traffic stop. A warrant is not reasonably subject to interpretation or abuse [citations], and the no-bail warrant here supplied legal authorization to arrest defendant that was completely independent of the circumstances that led the officer to initiate the traffic stop. [Citation.]" (*Id.* at p. 271.) As to the third factor, *Brendlin* concluded that the officer's insufficient justification for the stop "was not so obvious as to make one question [his] good faith in pursuing an investigation of what he believed to be a suspicious registration, nor does the record show that he had a design and purpose to effect the stop 'in the hope that something [else] might turn up.' [Citations.]" (*Ibid.*) Thus, *Brendlin* concluded that the outstanding arrest warrant for the defendant "sufficiently attenuated the connection between the unlawful traffic stop and the subsequent discovery of the drug paraphernalia." (*Id.* at p. 272.)

*Durant*, *supra*, 205 Cal.App.4th 57 applied the *Brendlin* factors in a case in which the independent intervening circumstance was a probation search condition. In *Durant*, the officer conducted a traffic stop after the defendant made a left turn from a dedicated left turn lane without activating his turn signal. (*Id.* at p. 61.) It was not until after the officer activated his patrol car lights that his fellow officer reminded him that the defendant was on probation. (*Ibid.*) In response to the officer's questioning, the defendant admitted that he was on probation and gave his consent to search him and his vehicle. (*Ibid.*) The officer searched the defendant and found a loaded handgun. (*Ibid.*) The defendant brought a motion to suppress evidence and argued that the traffic stop was unlawful because he had not violated the Vehicle Code. (*Ibid.*) The trial court denied the motion. (*Id.* at p. 62.)

The *Durant* court concluded that, even assuming that the traffic stop was unlawful, the defendant's probation search condition attenuated any taint under *Brendlin*. (*Durant*, *supra*, 205 Cal.App.4th at p. 65.) After noting that the discovery of the handgun occurred shortly after the traffic stop, the court focused on the second factor and stated that the

8

"search condition supplied legal authorization to search that was completely independent of the circumstances leading to the traffic stop." (*Id.* at p. 66.) As to the third factor, the court concluded that the purpose of the exclusionary rule would not be served because the officer was acting in good faith and did not act in "an arbitrary, capricious, or harassing manner." (*Ibid.*)

Here, as in *Brendlin*, there was a short period of time between the illegal detention and the search of the sedan. Vincent searched the sedan approximately 40 minutes after unlawfully detaining defendant. Relying on *People v. Boyer* (2006) 38 Cal.4th 412 (*Boyer*), disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, footnote 1, however, the Attorney General argues that the first factor weighs in favor of attenuation. The Attorney General's reliance is misplaced. In *Boyer*, the consent to search the house occurred several hours after the Fourth Amendment violation. (*Boyer*, at p. 450.) Thus, if relevant, this factor would weigh against attenuation.

As to the second factor, the intervening circumstance, defendant asserts that an arrest warrant is not analogous to a parole search condition. When an officer has confirmed the existence of an arrest warrant, he or she has a duty to arrest the individual. (See *People v. Hillyard* (1979) 589 P.2d 939, 941 ["Once he knew of the warrant, the officer would have been derelict in his duty not to have arrested defendant"].) In contrast, a parole search condition does not implicate a similar duty on the officer's part. Thus, defendant argues that since a parole search condition is a discretionary tool for law enforcement, it is less compelling as an independent intervening circumstance than an arrest warrant.

The Attorney General counters that *Brendlin's* conclusion that a warrant was not reasonably subject to interpretation or abuse was not based on whether the officer had a duty to arrest the defendant. Rather, it was based on *Hudson v. Michigan* (2006) 547 U.S. 586, which observed that compliance with the warrant requirement is easily determined because a warrant either exists or does not exist. (*Brendlin*, *supra*, 45 Cal.4th

9

at p. 271.)  The Attorney General thus argues that compliance with a search condition is also easily determined on the same ground.

Even if we were to assume that the parole search condition was an intervening circumstance, we find the third factor dispositive under the facts of this case.  "[T]he flagrancy and purposefulness of the police misconduct, is generally regarded as the most important because 'it is directly tied to the purpose of the exclusionary rule—deterring police misconduct.' [Citations.]" (*Brendlin*, *supra*, 45 Cal.4th at p. 271.)  In contrast to *Brendlin* and *Durant*, here, the officer purposefully committed misconduct.  Vincent admitted that he did not believe that the occupants of the sedan were related to any criminal activity that had occurred, was occurring, or was about to occur.  He detained them merely because they had been sitting in a vehicle in a high crime area for four minutes.  As every officer knows, a person's presence in a high crime area, standing alone, cannot serve as a basis for concluding that he or she has engaged, is engaged, or is about to engage in criminal conduct.  (*Brown v. Texas* (1979) 443 U.S. 47, 52.)  The present case was a classic example of a fishing expedition.  When Vincent's detention and questioning of defendant did not produce evidence of criminal activity, he prolonged the detention by turning to the other occupants " '"in the hope that something [else] might turn up.' [Citations.]" (*Brendlin*, *supra*, 45 Cal.4th at p. 271.)  As *Brendlin* recognized, the exclusionary rule was designed to protect individuals against this type of abuse.  Thus, we conclude that the existence of Evangelista's parole search condition which led to the search of the sedan did not cure the taint of the unconstitutional detention.  Accordingly, the trial court erred by failing to grant the motion to suppress the evidence.

The Attorney General argues that "the trial court implicitly found that Vincent did not engage in a fishing expedition, did not detain the occupants of the sedan for purpose of searching them, and did not engage in flagrant and purposeful misconduct."  However, this court defers to the trial court's factual findings if they are supported by substantial evidence.  (*Weaver*, *supra*, 26 Cal.4th at p. 924.)  There is no evidence to support these

10

findings.  Here, the officer detained defendant and the other occupants even though they were not even remotely connected to any criminal activity.

The Attorney General also argues that "[u]nlike the deputy in *Brendlin*, Vincent had no direct evidence that the occupants of the sedan were behaving in a lawful manner."  This argument is without merit.  In *Brendlin*, the officer believed that a traffic violation had occurred.  More importantly, the facts, as related by Vincent, established that they were behaving in a lawful manner.

### III.  Disposition

The order is reversed.


_____

Mihara, J.


WE CONCUR:




_____

Premo, Acting P. J.




_____

Grover, J.


11