# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

MARLON FLORES,
Defendant and Appellant.

S267522

Second Appellate District, Division Eight
B305359

Los Angeles County Superior Court
BA477784

May 2, 2024

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Liu, Kruger, Groban, Jenkins, and Evans concurred.

Justice Evans filed a concurring opinion, in which Justices Liu, Kruger, Groban, and Jenkins concurred.

PEOPLE v. FLORES

S267522

Opinion of the Court by Corrigan, J.

Police officers detained defendant, Marlon Flores, on a dark evening in an area known for narcotics and gang activity. The Court of Appeal held the totality of circumstances described below provided reasonable suspicion for the detention. We reverse.

## I. BACKGROUND

The following facts were adduced at the suppression hearing, at which Los Angeles Police Officer Daniel Guy was the only witness. In May 2019, around 10:00 p.m., Officer Guy and his partner, Michael Marino, were on patrol in the area of Mariposa Avenue. Guy considered the location to be a "known narcotic[s] area[]" and "gang hangout." He had arrested someone in the vicinity the night before for narcotics crimes. As the officers drove by a cul-de-sac, they saw Flores standing alone in the street beside a Nissan parked at a red curb. Flores looked at the officers, walked around the back of the car, then "ducked" behind it. The officers pulled up and parked behind the Nissan.

Officer Marino's body camera captured the interaction between Flores and the officers. The video begins as the officers park the patrol car but remain inside. At 0:15 seconds, Flores's head comes into view from behind the Nissan. He is in darkness. Flores stands and seems to be making a stretching motion with one arm. At 0:37 seconds, he disappears from sight. A few seconds later, he raises his head, then drops back out of

view. At 0:50 seconds, the officers step out of the car and approach him. A flashlight illuminates the way. At 0:55 seconds, Flores appears on the camera's recording. He is bent over and facing away from the officers with both hands near his right shoe. When Marino trains his flashlight on Flores, Flores does not look around. He remains bent over and continues moving his hands near his feet. The officers make no inquiry, but at 1:03, one of them tells Flores to stand up. Flores remains bent over. When Marino walks up behind Flores, Guy comes around the Nissan and approaches from the other side. At 1:12, Marino again directs Flores to stand. At 1:14, the officer says, "Hey, hurry up," and Flores begins to straighten. At 1:16, an officer tells Flores, "Your hands behind your head." Flores complies and is directly placed in handcuffs.

Officer Guy testified that he detained Flores because he believed Flores acted "suspicious[ly]" by "attempting to conceal himself from the police" and then "pretend[ing] to tie his shoe." The officer suspected Flores was "loitering for the use or sales of narcotics." Guy gave no reason why he thought so, other than the area and Flores's behavior upon seeing the police. During a pat-down search, the Nissan's "blinkers activated" as if the officer had "hit the key fob." Officer Guy pointed his flashlight into the car and saw what looked like a drug pipe. In response to the officer's inquiries, Flores said that the Nissan was his and his wallet, and identification, were in the driver's side door pocket. Guy retrieved the wallet, looked inside, and found a folded dollar bill containing suspected methamphetamine. Officers also recovered a revolver from a backpack.

The trial court denied Flores's motion to suppress the evidence seized. The court reasoned that Flores's acts of "ducking," "remaining hunched over," and "toying with his feet,"

2

even after the officers approached and told him to stand, was "odd behavior" and "suspicious." The court observed that "any normal human being would stand up and say, 'Oh, you scared me' or 'Oh, what can I help you with?' or 'Oh, why are you coming towards me?'" It found Flores's behavior "more than enough for this Court to find that there were articulable facts to find suspicion and enough for the officers to detain him, enough for the officers to thereafter question about identification."

Flores pleaded no contest to one count of carrying a loaded firearm. (Pen. Code, § 25850, subd. (a).) In exchange, one count of armed possession of methamphetamine was dismissed. (Health & Saf. Code, § 11370.1, subd. (a).) Pursuant to the terms of the bargain, he was ordered to serve three years' probation. Conditions included five days in county jail, 90 days in residential drug treatment, and 90 days of outpatient treatment.

The Court of Appeal affirmed the judgment in a divided opinion. The majority concluded that Flores was not detained until he was ordered to stand and put his hands behind his head. (*People v. Flores* (2021) 60 Cal.App.5th 978, 989 (*Flores*).) It found reasonable suspicion justified the detention based on the following facts: (1) "Flores saw police and tried to avoid contact with them by ducking down behind a parked car"; (2) during the ducking and crouching, Flores continually moved his hands, keeping them out of sight of the police; (3) as they approached, Flores "persisted in his odd crouch position for 'far too long a period of time'"; and (4) the activity occurred at 10:00 p.m. "on a cul-de-sac known for its illegal drug and gang activity." (*Id.* at pp. 989, 986.) As for whether Flores was simply engaged in the act of tying his shoe, the majority observed that "innocent possibilities" exist, but an officer "would have valid suspicions if

the person picked an unlikely moment for the task — in the dark, just after seeing police, and just after ducking once already — and if the person took an unusually long time at it. The trial court found Flores kept crouching for a suspiciously long time. Common sense takes context into account." (*Id.* at p. 990; see also *In re Tony C.* (1978) 21 Cal.3d 888, 894 (*Tony C.*).)

Justice Stratton opined in dissent that the detention began when officers parked their car, shined a light on Flores, and approached him from two sides. (*Flores*, *supra*, 60 Cal.App.5th at p. 992 (dis. opn. of Stratton, J.).) But even if the detention occurred later, after Flores's prolonged crouching, she was unpersuaded that reasonable suspicion was established. Justice Stratton accepted the trial court's factual finding that Flores ducked to avoid police contact, but she noted that he had a right to do so. (*Id.* at p. 993, citing *Florida v. Royer* (1983) 460 U.S. 491, 497–498 (plur. opn. of White, J.) (*Royer*).) In her view, Flores's behavior was "neither abnormal nor suspicious" given the "deep-seated mistrust certain communities feel toward police and how that mistrust manifests in the behavior of people interacting with them." (*Flores*, at pp. 993, 994.)

We granted review to determine whether Flores's detention was justified on these facts.

## II. DISCUSSION

"[T]he Fourth Amendment permits an officer to initiate a brief investigative . . . stop when [the officer] has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' [Citations.] 'Although a mere "hunch" does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously

less than is necessary for probable cause.' [Citations.] [¶] Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.' [Citation.] The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' [Citation.] Courts 'cannot reasonably demand scientific certainty . . . where none exists.' [Citation.] Rather, they must permit officers to make 'commonsense judgments and inferences about human behavior.'" (*Kansas v. Glover* (2020) 589 U.S. 376, 380–381 (*Glover*), italics omitted.)

In *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*), the United States Supreme Court first recognized the validity of a brief investigative detention, short of arrest, based on reasonable suspicion of criminal activity. (*Id.* at pp. 21–22, 27, 30.) It distinguished that requirement from the more demanding standard of probable cause necessary to justify an arrest. A review of *Terry* and its role in the evolution of Fourth Amendment jurisprudence provides illuminating context and perspective. It demonstrates the serious consideration given to judicial review of police investigative conduct over more than 50 years.

In *Terry* a plainclothes detective was on foot patrol in downtown Cleveland, watching particularly for the presence of shoplifters and pickpockets. At 2:30 in the afternoon he noticed two men he had not seen before standing on a corner. The detective did not approach the pair, but simply observed them for 10 to 12 minutes. During that time the detective saw the men stand on the corner. Then each separately walked down the street, paused to look in a particular shop window, walked

for a short distance past the shop, then retraced his steps, paused again at the same window, and rejoined his companion back on the corner, where they conferred. Each man separately engaged in that process five or six times. (*Terry, supra*, 392 U.S. at pp. 5–6.) After what the Court described as the "elaborately casual and oft-repeated reconnaissance of the store window" (*id.* at p. 6), the men left the corner together.

The detective decided to investigate further because he suspected the two men were " 'casing a job, a stick-up.' " (*Terry, supra*, 392 U.S. at p. 6.) He also suspected they might be armed. The men stopped in front of another store nearby and met with a third man. The detective had seen them talk briefly with the third man when the pair was at the original corner from which they had conducted their "oft-repeated reconnaissance." (*Ibid.*) The detective had no more information beyond what he had observed. He approached the three men, identified himself as an officer, and asked for their names. (*Id.* at pp. 6–7.) After they " 'mumbled something' " (*id.* at p. 7), the detective grabbed Terry, patted him down for weapons, and ultimately removed a revolver from his interior coat pocket. A second gun was found in his companion's overcoat. (*Ibid.*)

Chief Justice Warren wrote the opinion of the court. He began its discussion by quoting *Union Pacific Railroad Co. v. Botsford* (1891) 141 U.S. 250, which observed: " 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " (*Terry, supra*, 392 U.S. at p. 9, quoting *Union Pacific Railroad Co.*, at p. 251.)

The Chief Justice went on to note: "We would be less than candid if we did not acknowledge that this question [whether the detective's actions violated the Fourth Amendment] thrusts to the fore difficult and troublesome issues regarding a sensitive area of police activity — issues which have never before been squarely presented to this Court. Reflective of the tensions involved are the practical and constitutional arguments . . . on both sides of the public debate over the power of the police to 'stop and frisk' . . . suspicious persons." (*Terry*, *supra*, 392 U.S. at pp. 9–10.)

The opinion forcefully rejected the contention that a stop-and-frisk detention is a " 'petty indignity.' " (*Terry*, *supra*, 392 U.S. at p. 17.) "It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." (*Ibid*.) The opinion considered the argument that permitting a temporary detention like that involved in *Terry* would "only serve to exacerbate police-community tensions in the crowded centers of our Nation's cities." (*Id*. at p. 12.) It acknowledged that the "degree of community resentment aroused by particular practices is clearly relevant to an assessment of the quality of the intrusion upon reasonable expectations of personal security caused by those practices." (*Id*. at p. 17, fn. 14.) The *Terry* majority concluded that the officer had reasonable suspicion to suspect the two men were engaged in criminal activity and to fear for his safety. (*Id*. at pp. 22–23, 27–28, 30.) As a result the " 'stop and frisk' " (*id*. at p. 10) was permitted, and the weapons recovered were admissible in the underlying criminal proceeding (*id*. at pp. 8, 30).

In the years since *Terry* was decided, courts around the country have repeatedly addressed and applied its standards for

considering Fourth Amendment challenges to evidence recovered during investigative detentions. We do the same here.

" 'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232.) In doing so we do not consider each fact in isolation. Instead, "we must consider 'the totality of the circumstances — the whole picture.' " (*United States v. Sokolow* (1989) 490 U.S. 1, 8 (*Sokolow*), quoting *United States v. Cortez* (1981) 449 U.S. 411, 417 (*Cortez*).)

We need not determine the precise moment this detention took place. There is no dispute that Flores was detained before any incriminating evidence was recovered. One fair interpretation of the facts is that Flores initially tried to avoid being seen by the officers. Thereafter, and somewhat inconsistently, he stood and was in view for several seconds. He then failed to acknowledge the officers' approach, and sought to avoid interacting with them. But as we explain, this behavior, along with Flores's presence in a high crime area at night, did not provide a particularized and objective basis for suspecting that Flores was doing something illegal.

It is settled that a person may decline to engage in a consensual encounter with police. "The person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." (*Royer*, *supra*, 460 U.S. at pp. 497–498 (plur. opn. of White, J.); accord,

*Illinois v. Wardlow* (2000) 528 U.S. 119, 125 (*Wardlow*).) Such "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." (*Florida v. Bostick* (1991) 501 U.S. 429, 437 (*Bostick*); accord, *Wardlow*, at p. 125.) The reason that a truly consensual encounter does not implicate the Fourth Amendment is that the officer is simply approaching a person in a public place and engaging in " 'personal intercourse.' " (*Bostick*, at p. 434, quoting *Terry*, *supra*, 392 U.S. at p. 19, fn. 16; accord, *Royer*, at p. 497 (plur. opn. of White, J.).)[1] Officers, like others, may do so. But the officer must have legal cause to command the civilian's attention and cooperation. (*Royer*, at p. 498 (plur. opn. of White, J.).)

Nonetheless, "the *manner* in which a person avoids police contact" may be "considered by police officers in the field or by courts assessing reasonable cause for" a detention. (*People v. Souza* (1994) 9 Cal.4th 224, 234 (*Souza*).) The relevant inquiry is the " 'degree of suspicion that attaches to particular types of noncriminal acts.' " (*Sokolow*, *supra*, 490 U.S. at p. 10, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 243–244, fn. 13.)

In particular, the Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining

---

[1] As *Terry* noted: "Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, only to take a different turn upon the injection of some unexpected element into the conversation." (*Terry*, *supra*, 392 U.S. at p. 13.)

reasonable suspicion." (*Wardlow*, *supra*, 528 U.S. at p. 124.) Examples of relevant behavior include expressions of shock upon seeing an officer, ducking and hiding, headlong flight, a sudden change in direction, walking quickly away while looking back at the officer, and failing to acknowledge the officer's attempt to engage the suspect. (See, e.g., *District of Columbia v. Wesby* (2018) 583 U.S. 48, 59 (*Wesby*); *Wardlow*, at p. 124; *United States v. Brignoni-Ponce* (1975) 422 U.S. 873, 885 (*Brignoni-Ponce*); *Souza*, *supra*, 9 Cal.4th at pp. 234–235, 241– 242; *People v. Garcia* (1981) 121 Cal.App.3d 239, 243, 245–246; *Flores v. Superior Court* (1971) 17 Cal.App.3d 219, 221, 224.) Repeated or inordinate attempts to avoid an officer may be particularly noteworthy.

"[P]resence in an area of expected criminal activity" is also a relevant consideration. (*Wardlow*, *supra*, 528 U.S. at p. 124; accord, *Souza*, *supra*, 9 Cal.4th at pp. 240–241.) " '[I]t would be the height of naivete not to recognize that the frequency and intensity' " of criminal activity is " 'greater in certain quarters than in others.' " (*Souza*, at p. 241, quoting *People v. Holloway* (1985) 176 Cal.App.3d 150, 155.) But it is equally true that a great many law-abiding Californians live, work, or otherwise find themselves in areas where criminal activity is prevalent. Their mere presence there cannot be said to transform them into suspects. Instead, it is "a factor that can lend meaning to the person's behavior." (*People v. Limon* (1993) 17 Cal.App.4th 524, 532 (*Limon*).) But "standing alone, [it] is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (*Wardlow*, at p. 124; accord, *Brown v. Texas* (1979) 443 U.S. 47, 52; *People v. Casares* (2016) 62 Cal.4th 808, 838; *Souza*, at p. 241.)

The record, considered in its totality, fails to support a reasonable suspicion that Flores was loitering for the purpose of committing a narcotics offense (as the officer suspected) or was otherwise engaged in " 'criminal activity.' " (*Glover, supra,* 589 U.S. at p. 380.) An articulable and reasonable suspicion that a person is engaging in criminal activity is required to escalate a consensual encounter to a coercive detention.

Here, Flores looked in the direction of the officers then walked behind a car and ducked out of sight. As the officers parked, Flores raised his head, stood and stretched, then again disappeared from sight. A few seconds later he raised his head a second time, and then dropped back out of view. When the officers approached on foot, he remained bent over "toying with his feet." He did not make eye contact or otherwise acknowledge their attempts to engage him. It is not out of the ordinary for a person to engage in a pretext such as walking in another direction, pretending not to hear one's name being called, or feigning cell phone use to avoid an unwanted encounter. But here, Flores's apparent pretext of tying his shoe, combined with his repeatedly ducking down behind the car, could reasonably be construed as "odd" and noteworthy behavior, particularly when done in reaction to the sight of a uniformed police officer. (See *Wesby, supra,* 583 U.S. at p. 59; *Wardlow, supra,* 528 U.S. at p. 124; *Souza, supra,* 9 Cal.4th at p. 234.) Nonetheless, it bears emphasis that the standard to justify a detention is not satisfied simply because a person's behavior is "odd." A mere deviation from perceived social convention does not automatically signal criminal behavior. The particular conduct relied upon must, when considered in the totality of circumstances, support a reasonable suspicion that the person to be detained is, or is about to be, engaged in activity "relating

to crime." (*Tony C.*, *supra*, 21 Cal.3d at p. 893; accord, *Souza*, *supra*, 9 Cal.4th at p. 231.)

The fact that Flores was present in a "known narcotic[s] area[]," where the officer had arrested someone for drug-related crimes the night before, does not tip the scales in favor of detention. Notably, Officer Guy did not see Flores engage in any conduct suggesting he was there to buy or sell drugs or was otherwise involved in illegal conduct. He did not see Flores interact with anyone, or retrieve or hide anything. (See *Cornell v. City and County of San Francisco* (2017) 17 Cal.App.5th 766, 781; *Limon*, *supra*, 17 Cal.App.4th at pp. 532–533; Health & Saf. Code, § 11532, subd. (b).) He did not see anyone in the immediate vicinity. No one had called for help or to report a crime in progress. The hour was not particularly late. Although the officer testified that he suspected Flores of "loitering," he did not see Flores standing in that location for more than a few moments before the officers pulled up in their patrol car.[2] When Guy approached on foot, he saw Flores moving his hands near his feet. But the officer did not say Flores appeared to hide or discard anything. Rather, he opined that Flores was "pretend[ing] to tie his shoe." Guy testified that the Nissan was parked at a red curb. But he did not explain how Flores's

---

[2] Health and Safety Code section 11532 makes it a crime to "loiter in any public place in a manner and under circumstances manifesting the purpose and with the intent to commit" certain drug related crimes. Section 11530, subdivision (a) defines "Loiter" as "to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered." Because Flores was neither charged with nor convicted of loitering, we need not parse the statutes in detail.

presence next to an illegally parked car justified a detention under the totality of the circumstances.

In referring to factors not testified to in this case, we do not suggest that any of them must be established to justify a detention. Instead, we point out that, if present, they would be relevant in weighing all the circumstances bearing on whether a detention was justified. Likewise, facts that may appear benign in some contexts may reasonably be considered less so in others. Officers describing their decisions may certainly explain the salience of some circumstances in light of their training and experience. As the high court pointed out in *Cortez*, *supra*, 449 U.S. at page 418, a trained police officer could draw inferences "that might well elude an untrained person." But the officer must articulate that experience and expertise as an objective circumstance justifying the detention. (*Ibid.*; *United States v. Arvizu* (2002) 534 U.S. 266, 273, 276–277; *Brignoni-Ponce*, *supra*, 422 U.S. at pp. 884–885.) In evaluating what was done it is important to consider the reasons given for doing it. Requiring this articulation enables the court to determine, as a matter of law, whether the officer's actions were justified in light of the protections afforded by the Fourth Amendment.

The Attorney General relies heavily on *Wardlow*, *supra*, 528 U.S. 119 to justify Flores's detention, but the facts of that case are distinguishable. There, a four-car caravan of police vehicles converged on a Chicago area "known for heavy narcotics trafficking." (*Id.* at p. 121.) "The officers were traveling together because they expected to find a crowd of people in the area, including lookouts and customers." (*Ibid.*) The defendant, who was holding an opaque bag, looked in the direction of the officers and fled. (*Id.* at pp. 121–122.) The court held that the defendant's presence in a heavy narcotics area and his

"[h]eadlong flight" upon seeing the police approach "justified [the officer] in suspecting that [the defendant] was involved in criminal activity, and, therefore, in investigating further." (*Id.* at pp. 124, 125.)

Wardlow's flight upon seeing the officers was an important factor in the analysis. The high court recognized that citizens have the right to ignore the police and go about their business, and the " 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' " (*Wardlow*, *supra*, 528 U.S. at p. 125, quoting *Bostick*, *supra*, 501 U.S. at p. 437.) But the court reasoned that "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." (*Wardlow*, at p. 125.) "Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." (*Id.* at p. 124.) Seven members of the high court reaffirmed this holding in 2018: " '[U]nprovoked flight upon noticing the police,' we have explained, 'is certainly suggestive' of wrongdoing and can be treated as 'suspicious behavior' that factors into the totality of the circumstances. [Citation.] In fact, 'deliberately furtive actions and flight at the approach of . . . law officers are *strong* indicia of *mens rea.*' " (*Wesby*, *supra*, 583 U.S. at p. 59, quoting *Wardlow*, at pp. 124–125 & *Sibron v. New York* (1968) 392 U.S. 40, 66; accord, *Souza*, *supra*, 9 Cal.4th at pp. 234–235.)

Flores's disinclination to engage with the officers does not carry the same salience as headlong flight in the totality of the circumstances analysis. His acts of ducking out of sight, bending with his hands by his shoe, and not acknowledging the officers' presence, suggest an unwillingness to be observed or

interact. But they are not the "consummate act of evasion." (*Wardlow, supra,* 528 U.S. at p. 124.) The officers certainly could have continued to observe Flores as he stood on the public street. But the behavior here, while noteworthy, does not support a reasonable suspicion that he was engaged in *illegal* activity. In short, Officer Guy failed to articulate "more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." (*Wardlow*, at p. 124, quoting *Terry, supra,* 392 U.S. at p. 27.)

In his answer to the amici briefs, the Attorney General relies on the statute that prohibits loitering for the purpose of engaging in certain drug related offenses to justify the detention. (See fn. 2, *ante*.) Health and Safety Code section 11532 provides that a person's attempt to "to conceal himself or herself or any object that reasonably could be involved in an unlawful drug-related activity" is a relevant circumstance in determining whether a person is loitering with the requisite criminal intent, and further provides that the relevant circumstances listed in the statute "should be considered particularly salient if they occur in an area that is known for unlawful drug use and trafficking . . . ." (*Id.*, subds. (b)(3), (c).) However, this pronouncement cannot supplant the standard of reasonable suspicion mandated by the Fourth Amendment. In order to detain a citizen on suspicion of loitering, or of criminal activity more generally, officers must have "the level of suspicion sufficient to justify a *Terry* stop . . . ." (*Kolender v. Lawson* (1983) 461 U.S. 352, 360 [discussing Pen. Code, former § 647, subd. (e)]; see also *id.* at p. 353.)

The facts here contrast with other cases in which we have upheld investigative detentions. In *Souza, supra,* 9 Cal.4th 224, an officer was patrolling at 3:00 a.m. in a residential

neighborhood where burglaries and drug activity were common. He noticed Souza and another person standing near a car parked at the curb, in almost complete darkness. The officer pulled up behind the parked car and activated his spotlight. Immediately, two other people in the car bent down towards the floorboard area, whereupon Souza ran away. He was apprehended and searched, revealing contraband. (*Id*. at p. 228.) We held that the totality of these circumstances justified the detention: "From these circumstances — the area's reputation for criminal activity, the presence of two people near a parked car very late at night and in total darkness, and evasive conduct not only by defendant but by the two occupants of the parked car — Officer Stackhouse reasonably suspected that criminal activity was afoot." (*Id*. at p. 240.)

In *People v. Brown* (2015) 61 Cal.4th 968 (*Brown*) "a citizen living in a residential neighborhood made an emergency call seeking police assistance because a fight was happening in an alley behind the citizen's home. The caller gave a specific address . . . [and] heard screaming and a reference to a loaded gun. The dispatcher heard screaming as well . . . . [¶] Within three minutes of dispatch [a deputy sheriff] arrived with lights and siren activated. Brown, the only person in the alley, was driving a car away from the reported location of the fight. It was after 10:30 p.m." (*Id*. at p. 986.) The deputy yelled to Brown, " 'Hey. Did you see a fight?' Brown did not respond and kept driving." (*Id*. at p. 973.) "Brown left the alley but drove back toward the scene on the main street" (*id*. at p. 986) and parked a few houses down from the house behind which the fight had occurred (*id*. at p. 973). We concluded under these circumstances that "it was reasonable for [the deputy] to suspect the sole occupant of the alley may have been involved in the fight

and to effectuate a brief and minimally intrusive detention, which immediately yielded observations of criminal activity." (*Id.* at p. 987.)

Here, unlike *Wardlow* and *Souza*, there was no headlong flight. The other factors discussed by *Souza* — early morning hour and multiple persons all engaged in evasive conduct — were likewise absent. And, unlike *Brown*, there was no contemporary citizen request for assistance due to criminal activity in the location where Flores was seen. The circumstances here, viewed in totality, are insufficient to provide reasonable suspicion that Flores was engaged in criminal activity.

Our conclusion does not leave officers without the means to follow up on behavior they view as calling for additional investigation. Flores was present in a high crime area and repeatedly tried to avoid being seen by, or engaging with, the police. Those facts are certainly noteworthy. The officers would have been well within the bounds of the Fourth Amendment to continue to watch Flores as he stood on the street, as did the detective in *Terry*. They were entitled to approach Flores and engage him in consensual conversation. They could have asked if he needed assistance, or had himself noted anything out of the ordinary in the vicinity. If they made additional observations while doing so, those observations may have changed the calculus. But Flores's mere refusal to cooperate "d[id] not furnish the minimal level of objective justification needed for a detention or seizure." (*Bostick, supra,* 501 U.S. at p. 437; accord, *Wardlow, supra,* 528 U.S. at p. 125; *Royer, supra,* 460 U.S. at p. 498 (plur. opn. of White, J.).)

The concurring opinion emphasizes "the danger in considering 'nervous' and 'evasive' behavior," including "ignoring or walking, driving, or running away from officers," given the real world experience of minority communities with police violence and racial profiling. (Conc. opn. of Evans, J., *post*, at pp. 1, 2.) Flores, Justice Stratton in dissent below, and amici[3] here, likewise highlight the issues of race or ethnicity and policing. They build on the important concerns voiced in *Terry* and augment them with the lessons of more recent history. Consistent with these arguments, some out-of-state authorities hold that a community's or group's experience with law enforcement is a significant factor of which officers must be mindful and courts should consider in evaluating the objective reasonableness of any asserted suspicion of criminality. (See, e.g., *United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1156–1157; *Commonwealth v. Warren* (Mass. 2016) 58 N.E.3d 333, 342.) In authorizing "stop and frisk" detentions, the court in *Terry* recognized that "community resentment aroused by particular practices is clearly relevant" to assessing the nature of intrusions upon "reasonable expectations of personal security" of those whom police encounter. (*Terry*, *supra*, 392 U.S. at p. 17, fn. 14.) With respect to the standard's application in a given case, the high court has consistently held that an objective evaluation of the totality of the circumstances is the touchstone of Fourth Amendment scrutiny. In making that assessment, it is imperative that the circumstances confronting both the officer and the citizen be judged against an objective

---

[3] The Office of the State Public Defender, the California Public Defender's Association, and the Contra Costa County Public Defender's Office have filed amicus briefs in support of Flores.

standard. (*Ashcroft v. al-Kidd* (2011) 563 U.S. 731, 736; *Michigan v. Chesternut* (1988) 486 U.S. 567, 574; *Terry*, at pp. 21–22.)

We apply well-established law in concluding that the detention here was unauthorized. In reaching that conclusion, we are not called upon to grapple with the important and broader issues referenced above. Flores had the right to decline further interaction with the officers and, under these facts, the officers had no authority to compel him to do otherwise. The trial court took the view that "any normal human being would stand up and say, 'Oh, you scared me' or 'Oh, what can I help you with?' or 'Oh, why are you coming towards me?' " But the reactions described by the court are not the only neutral ways that an ordinary person might interact with police, or decline further interaction.

Notwithstanding today's holding, it remains true that "nervous, evasive behavior" need not be ignored. (*Wardlow*, *supra*, 528 U.S. at p. 124.) It is "a pertinent factor in determining reasonable suspicion" based on all the circumstances. (*Ibid*.) Likewise, the possibility of an innocent explanation for evasive behavior, such as a desire to avoid police contact out of fear for one's safety, does not render the behavior insignificant. (*Id*. at p. 125; *Brown*, *supra*, 61 Cal.4th at pp. 985–986; *Souza*, *supra*, 9 Cal.4th at pp. 233, 235; *Tony C.*, *supra*, 21 Cal.3d at p. 894.) The *Terry* court noted that the series of acts initially observed by the detective might each be innocent in and of themselves. (*Terry*, *supra*, 392 U.S. at pp. 22–23.) "There is nothing unusual in two men standing together on a street corner . . . . Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in."

(*Ibid.*)  The court noted, however, that the particular facts the detective noted told a different story and justified some sort of further investigation.  (*Id.* at p. 23.)  But the crux of the case did not turn on whether some form of further investigation was proper but whether, in particular, there was justification for a detention, resulting in the "invasion of Terry's personal security."  (*Ibid.*)  Based on the totality of circumstances, including a reasonable suspicion the men might be armed, the majority concluded the officer was within his lawful scope of authority to seize Terry and conduct a pat-down for weapons. (*Id.* at pp. 22–23, 27–28, 30.)

"In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people.  Indeed, the Fourth Amendment accepts that risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent.  The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further.  If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." (*Wardlow, supra,* 528 U.S. at p. 126; accord, *Brown, supra,* 61 Cal.4th at pp. 985–986; *Souza, supra,* 9 Cal.4th at pp. 233, 235; *Tony C., supra,* 21 Cal.3d at p. 894.)

Writing separately in *Wardlow,* Justice Stevens discussed potentially innocent reasons that a person might flee from the police, including fear of police violence.  (*Wardlow, supra,* 528 U.S. at pp. 128–135 (conc. & dis. opn. of Stevens, J.).)  But Justice Stevens did not argue that evasive behavior such as flight was of nominal or no significance to the reasonable suspicion inquiry.  Instead, he explained why the court correctly declined to adopt a bright line rule authorizing detention of

persons who flee from the police: " '[u]nprovoked, flight,' in short, describes a category of activity too broad and varied to permit a *per se* reasonable inference regarding the motivation for the activity . . . . The totality of the circumstances, as always, must dictate the result." (*Id.* at p. 136 (conc. & dis. opn. of Stevens, J.).)

As a matter of precedent and as a matter of sound reason, the establishment of reasonable suspicion will always be contextual. It will be informed by the totality of circumstances and objective scrutiny of the reasons given for an officer's decision to infringe upon "the right of every person to enjoy the use of public streets, buildings, parks, and other conveniences without unwarranted interference or harassment by agents of the law." (*Tony C., supra*, 21 Cal.3d at p. 893.)

To be clear, officers may observe what people do in public places. They may consider what they see in plain view and determine whether what they observe merits further observation, inquiry, or intervention. They may approach people in public, engage them in consensual conversation, and take note of their appearance and behavior. Nervous behavior and attempts to conceal oneself may provide relevant context. But before officers may *detain* someone they must be able to articulate a legally cognizable reason to infringe on that person's liberty.

The Fourth Amendment recognizes a measured framework for acceptable official intrusion upon the life of any individual. Police officers and private individuals may well occupy the same public space and have no particular interaction. They may also engage in consensual encounters. But before an officer can compel compliance with a show of authority,

articulable facts must support a reasonable suspicion of criminal activity. In the absence of such facts, the person is constitutionally protected and empowered to go on his or her way.

The body of America's Fourth Amendment jurisprudence reflects the effort to strike a balance between the state's obligation to responsibly and legitimately meet the critical needs of public safety with the nation's founding and enduring commitment to protect the individual liberty ensured to all its people. The officers' detention of Flores, under the circumstances relied upon here, failed to maintain that balance.

### III. DISPOSITION

We reverse the judgment of the Court of Appeal. The matter is remanded with directions that the case be returned to the trial court to permit Flores to withdraw his no contest plea and the court to enter an order granting Flores's suppression motion. (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1053; *People v. Miller* (1983) 33 Cal.3d 545, 556.)

**CORRIGAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

PEOPLE v. FLORES

S267522


Concurring Opinion by Justice Evans


I agree with today's opinion that the detention of defendant Marlon Flores was unlawful. In bending over with his hands by his shoe and refraining from acknowledging the officers' presence, Flores indicated he was either going about his business or attempting to avoid engaging with the police — both of which were within his rights to do. As the majority concludes, the fact that Flores operated within his rights in a high crime area did not transform his behavior into grounds to detain him. Based on the totality of the circumstances, there was no reasonable suspicion that Flores was engaged in criminal activity that would justify his detention.

I write separately to explain why one's attempts to avoid engaging with the police — in whatever lawful manner — must be viewed with care and caution when evaluating the legality of a detention. The trial court's observations and the Attorney General's arguments highlight the danger in considering "nervous" and "evasive" behavior in the totality of the circumstances analysis when devoid of real world context. The trial court's rationale for deeming Flores's conduct "suspicious" was that Flores failed to act as "any normal human being" would, specifically that "any normal human being would stand up and say, 'Oh, you scared me' or 'Oh, what can I help you with?' Or 'Oh, why are you coming towards me?' " By expecting Flores to interact with the police with pleasantries — even as police approached him like a suspect — the trial court seemed to

indicate that Flores could not decline a "consensual" interaction unless he behaved in a very particular way. This is clearly not the law. (See *Florida v. Royer* (1983) 460 U.S. 491, 497–498.) While the Attorney General recognized Flores was within his legal right to decline interacting with the police, he too faulted Flores for failing to exercise this right in a particular manner. During oral argument, the Attorney General asserted that Flores could have "simply gotten in his car . . . [and] driven away," "could have walked away," and "could have told the officers that he didn't want to engage with them." While these technically may have been legally available options, such actions may have been and often are perceived by law enforcement as escalating behavior meriting an escalated police response, including potential pursuit and/or use of force. (See, e.g., Eisenberg, *Criminal Law: Policing the Danger Narrative* (2023) 113 J. Crim. L. & Criminology 473, 507–508.)

Contrary to the trial court's and Attorney General's suggestions, the Fourth Amendment does not require that citizens engage or decline from engaging with police in a particular manner in order to be free from police detention. It is therefore not surprising courts have concluded that attempting to avoid police interaction, including ignoring or walking, driving, or running away from officers, generally should have limited significance — if any — "[w]here a suspect is under no obligation to respond to a police officer's inquiry." (*Commonwealth v. Warren* (Mass. 2016) 58 N.E.3d 333, 341 (*Warren*).) A contrary conclusion, these courts have reasoned, would enable " 'the police [to] turn a hunch into a reasonable suspicion by inducing the [behavior] justifying the suspicion.' " (*Ibid.*)

Importantly, naïve or ill-informed notions of police interactions must not shape our Fourth Amendment jurisprudence and must not compromise Californians' Fourth Amendment rights. It may be a reasonable response for an individual to reflexively "freeze" or flee when being approached by officers. (See Skalstad, *Transformative Mediation Twenty Years Later: An Invitation to Discuss Post-Traumatic Stress Disorder and Legal Ethics* (2016) 1 Concordia L.Rev. 1, 17 ["the fight-flight-freeze response is a reflex and the product of the autonomic nervous system"].) As numerous judges before us have recognized, many individuals — including, particularly, people of color — commonly hold a perception that engaging in any manner with police, including in seemingly casual or innocuous ways, entails a degree of risk to one's safety. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 132 (conc. opn. of Stevens, J.) ["Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous"].) This perception is based on the unfortunate and longstanding realities of policing in many minority communities across the country, as well as the police killings of Oscar Grant, Eric Garner, Michael Brown, Akai Gurley, Tamir Rice, Calvon Reid, Anthony Hill, Eric Harris, Dontay Ivy, Walter Scott, Freddie Gray, Jr., Greg Gunn, Deravis Rogers, Terence Crutcher, Jordan Edwards, Dennis Plowden, Jr., Stephon Clark, Chinedu Okobi, George Robinson, Jimmy Atchison, Javier Ambler II, Ryan Twyman, Elijah McClain, Cameron Lamb, William Howard Green, Manuel Ellis, Breonna Taylor, Daniel Prude, George Floyd, Andre Hill, Calvin Wilks, Jr., Quadry Sanders, Jayland Walker, Tyre Nichols, Ta'Kiya Young and her

unborn child, and thousands of other people in the last decade alone.  (See, e.g., Police Shootings Database, The Washington Post, <https://www.washingtonpost.com/graphics/ investigations/police-shootings-database/> [as of May 2, 2024].)[1] In short, police killings of Black and Brown children, men, and women "have occurred with distressing frequency throughout the country and here in California."  (*B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 30 (conc. opn. of Liu, J.).)  Due to this searing history and the present day experiences of far too many people in the United States, for generations, legions of parents in minority communities have given their children "the talk"— detailing survival techniques for how to navigate interactions with police "all out of fear of how an officer with a gun will react to them."  (*Utah v. Strieff* (2016) 579 U.S. 232, 254 (dis. opn. of Sotomayor, J.).)  Given this context, it is apparent why attempting to avoid police officers reflects, for many people, simply a desire to avoid risking injury or death.

Despite growing recognition of the deep-seated issues in policing in our country, it is still the case that communities of color disproportionately experience heightened levels of police scrutiny and racial profiling.  "Not only are Black people stopped and searched more often, but such searches are less likely to yield evidence or contraband."  (*People v. McWilliams* (2023) 14 Cal.5th 429, 451 (conc. opn. of Liu, J.), citing Lofstrom et al., Racial Disparities in Law Enforcement Stops (Oct. 2021) p. 25 and Ayers & Borowsky, A Study of Racially Disparate Outcomes in the Los Angeles Police Department (Oct. 2008) pp. 7–8.)  A

---

[1]     All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/ 38324.htm>.

recent report found that out of more than 4.5 million law enforcement stops recorded throughout California in 2022, Black individuals were stopped 131.5 percent more frequently relative to their proportion of the population and Hispanic individuals comprised the largest racial group of stopped individuals. (Racial and Identity Profiling Advisory Board, Annual Report 2024 (Jan. 1, 2024) pp. 6–7 <https://oag.ca.gov/system/files/media/ripa-board-report-2024.pdf> [as of May 2, 2024].) Stopped Black and Hispanic individuals were more likely to be searched than stopped White individuals, while officers arrested and handcuffed Native Americans at the highest rates. (*Id.* at pp. 37, 42, 48–49.) Officers were less likely to discover contraband when searching individuals of every other racial or ethnic group as compared to White individuals. (*Id.* at p. 49 ["Discovery rates were lower during stops with searches of all racial or ethnic groups of color"]; see also *ibid.* ["Compared to White individuals, Black individuals had a higher probability of being searched . . . despite being less likely to be found in possession of contraband or evidence"].) Based on the reality illustrated by these statistics, attempting to avoid police officers may also reflect, for some people, a "desire to avoid the recurring indignity of being racially profiled." (*Warren, supra*, 58 N.E.3d at p. 342.)

Today's opinion notes that some courts have begun accounting for the impact of racial disparities in policing in the totality of the circumstances analysis.[2] The opinion does not

---

[2] Today's opinion also discusses the statute criminalizing loitering for the purpose of engaging in drug activity, Health and Safety section 11532. (Maj. opn., *ante*, pp. 12, 15.) The legality

rely on such considerations, but neither does it foreclose future litigants from developing arguments about how racial disparities in policing might inform one's decision to avoid contact with the police. While the evaluation of whether an individual's behavior supports a finding of reasonable suspicion is an objective one, a test that fails to account for the realities of so many Californians would not be a reasonable one.

I concur.

**EVANS, J.**

**We Concur:**

**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

---

of that statute's provisions is not directly before us. In 2022, the governor signed legislation repealing Penal Code section 653.22, a statute criminalizing loitering for the purpose of engaging in prostitution. The governor noted, "[T]he crime of loitering has disproportionately impacted Black and Brown women and members of the LGBTQ community. Black adults accounted for 56.1% of the loitering charges in Los Angeles between 2017–2019, despite making up less than 10% of the city's population." (Governor Gavin Newsom, Letter to State Senators re Sen. Bill No. 357 (2021–2022 Reg. Sess.) July 1, 2022 <https://www.gov.ca.gov/wp-content/uploads/2022/07/SB357-Signing-Message-7.01.2022.pdf> [as of May 2, 2024].) The Legislature may wish to evaluate Health and Safety Code section 11532 to determine whether it presents similar constitutional concerns.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Flores

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 60 Cal.App.5th 978
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S267522
**Date Filed:** May 2, 2024

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Mildred Escobedo

_____

**Counsel:**

Richard L. Fitzer, under appointment by the Supreme Court, for Defendant and Appellant.

Ellen McDonnell, Public Defender (Contra Costa), and Gilbert Rivera, Deputy Public Defender, for the California Public Defenders Association and the Contra Costa County Public Defender as Amici Curiae on behalf of Defendant and Appellant.

Galit Lipa, State Public Defender, and Jessie Hawk, Deputy State Public Defender, for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez, Michael C. Keller, Chung L. Mar and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard L. Fitzer
Attorney at Law
6285 East Spring Street, 276N
Long Beach, CA 90808
(562) 429-4000

Shezad H. Thakor
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6109