Filed 3/28/25  P. v. Icea CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B334446 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. TA139579 |
| v. | |
| ALVA L. ICEA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, H. Clay Jacke II and Sean D. Coen, Judges. Affirmed.

William G. Holzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

Alva L. Icea appeals from her conviction for first degree residential burglary. Icea contends the trial court should have granted her motion under Penal Code section 1538.5[1] to suppress the evidence of her crime. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

In March 2016, the People charged Icea with the first degree residential burglary of an inhabited dwelling occupied by Kornel Garme Crisostomo. The People alleged Icea had a strike prior, also for first degree residential burglary. The court arraigned Icea on the information on May 13, 2016. Icea apparently was released on her own recognizance.

Icea's counsel filed a motion to suppress evidence. The prosecution apparently filed a response. The record on appeal does not contain either the motion or the response. On August 31, 2016, the court (the Honorable H. Clay Jacke II) held a hearing on the motion.

Deputy Sheriff Emily Dilelio testified the Carson station "received a prowler call" around 1:25 p.m. on March 15, 2016. "The call stated that a female Hispanic with a colored shirt" and dark blue pants "was riding a bike out of a location" on West 230th Street in Carson. Dilelio "requested for an aero to respond."[2] The aero "saw a female matching the description

_____

[1] References to statutes are to the Penal Code.

[2] By "aero," Dilelio was referring to a helicopter. Deputy Bryan Marr testified at trial that he worked as a tactical flight deputy who "ride[s] around in a helicopter all day long." He helps deputies "with whatever they need," from "finding suspects" to "look[ing] for lost hikers." On the day in question, Marr received a dispatch to a location on West 230th Street. He saw a woman get off her bicycle at the front of the house, walk underneath

2

riding southbound on Main Street on a black bike." Before arriving at the location, Dilelio had "information" that "the female Hispanic was seen exiting the rear of the location."

Dilelio went to the location and saw a woman riding a black bike. At the suppression hearing, Dilelio identified that woman as Icea. Dilelio and her partner Johnny Romero—who was Dilelio's trainee—told Icea to stop and asked her to get off the bike. They "detained her pending a burglary investigation." Icea was carrying a purse. Dilelio "wanted to pat her down and make sure she didn't have any weapons . . . on her." Romero took Icea's purse immediately.

Dilelio and Romero walked Icea over to stand outside the patrol car. Romero was just holding the purse in his hands. Dilelio asked Icea for her identification. Icea "told [Dilelio] it was in her purse and that [Dilelio] could get it." Romero then "retrieved [Icea's] I.D. along with a vehicle title to the residence that was just burglarized." The vehicle title was "right in the middle of the purse," "[a]s you open it." It "had the address [on it] that was in the call" to the station. Icea then "spontaneously said, 'I wasn't inside the house. I was in the backyard.' "

On cross-examination at the hearing, Dilelio testified a "witness" had "called in" about the prowler. Dilelio and her partner arrived at the location three to five minutes later. At that point, no one (except the 911 operator) had spoken to the witness who reported the suspicious activity. Dilelio said she'd "had another unit go over to the location and make contact"

the front porch, then walk around on the south side of the house. Marr also saw the woman briefly on the north side of the house. Marr eventually directed deputies "to that location on [We]st 230th."

with the witness. When asked, "So at the point in time that your partner went into Ms. Icea's purse, you did not know if there had even been a crime committed, correct?", Dilelio replied, "That's correct, ma'am." When asked why she didn't have Icea get her I.D. out of her purse, Dilelio replied, "For my safety, ma'am, I don't allow people to go into stuff." Dilelio said she always "ask[ed] first."

Icea testified on her own behalf at the hearing. Icea said she was riding her bike, "looking for someone's house." She was carrying only her purse. The police told her to stop and she did. Icea testified, "The male officer approached me and asked me to hand him my purse, and I did. He put it on the hood of the car."

The male officer then "told [Icea] to interlock [her] fingers behind [her] back." Icea testified the male officer "patted [her] down, and he walked [her] to the vehicle and put [her] in the [back seat of the] patrol car" and closed the door. He did not ask her for identification. Through the car window, Icea said, she could see "them going in [her] purse." Icea testified the officers did not ask if they could search her purse, or ask her where her I.D. was, or tell her they were going to search the purse. Icea denied having told the deputies they could "enter" her purse.

When asked by the prosecutor if her purse had "contain[ed]" "the vehicle title belonging to an individual by the name of Cristomo Garme [*sic*]," Icea replied, "Yes."

The court denied the suppression motion. The court told defense counsel, "If I'm a cop, I get information that, hey, there's a suspicious person leaving, I'm going to stop the person. Okay. You've got to stop them." The court viewed the key issue not as the validity of the detention but as the consent to search

4

the purse.  The court stated, "I don't have a problem with the initial stop."  The court concluded, "[B]ased upon all the evidence adduced, the court believes that there was valid consent."

On April 3, 2017, the case proceeded to trial before the Honorable Pat Connolly.  Voir dire began and continued on the next court day, April 5.  At the end of that court day, Icea requested—and the court conducted—a *Marsden*[3] hearing.  The court denied Icea's *Marsden* motion and ordered Icea to return to court the next day.

On the next day, April 6, Icea did not appear in court.  Icea's boyfriend called the court to say Icea was "not feeling well, and she was either in the hospital or they were going to the hospital."  The court sent the jurors home.  Later that afternoon, defense counsel told the court she'd called the emergency department at Harbor UCLA and a nurse confirmed Icea was there and "waiting for a room."  The court issued a warrant for Icea's arrest.

On the following Monday, April 10, Icea did not appear.  The court directed both counsel to call Harbor UCLA.  The court and counsel confirmed there was no one at the hospital by that name, and "there was no patient there that was admitted."  The court found Icea had voluntarily absented herself from the proceedings and—over defense counsel's objection—the trial would proceed with Icea in abstentia.[4]

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118.

[4]     After counsel had presented opening statements, a "messenger" arrived in the courtroom with "a motion for [an] emergency writ," filed by Icea in propria persona, "asking either for a 170.6 on [Judge Connolly], or . . . a motion for new counsel."

5

After hearing from nine witnesses, the jury convicted Icea of the charge. The jury also found true the allegation that Icea had suffered a prior strike. The warrant remained outstanding.

Some five and a half years later, Icea was apprehended on the warrant. When brought to court on November 16, 2022, Icea told the court, "I filed 170.6 motion with Mr. Connolly, and he denied me. He ignored it." Icea replaced her court-appointed attorney with retained counsel. On February 9, 2023, the case was reassigned to the Honorable Sean D. Coen. Icea's new counsel told the court Icea "was in the emergency [*sic*] with a severe anxiety attack on April 6, 2017," after the court denied her *Marsden* motion.

On July 7, 2023, Icea's counsel filed a motion for a new trial. The prosecution filed an opposition. After hearing argument, the court denied the new trial motion.

On September 26, 2023, the court sentenced Icea to 13 years in the state prison, calculated as the midterm of four years, doubled because of the strike prior, plus five years for the serious felony prior under section 667, subdivision (a)(1).

## DISCUSSION

The sole issue Icea raises on appeal is the legality of her detention and the search of her purse, resulting in the discovery of a title to the victim's vehicle. Icea contends Dilelio did not have a "reasonable suspicion" to detain her because Dilelio didn't "know the source of" the "prowler" report nor did she know whether Icea lived at the residence or might have been "merely a caretaker, house cleaner, dog-walker, or visitor." Icea also contends Romero "exceeded the scope" of her consent to "remove her I.D. card from the purse." She asserts she

6

"did not give permission for a general search of the purse or for any other item to be removed."

A defendant may move to suppress evidence on the ground that a search or seizure without a warrant was unreasonable. (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. (*People v. Redd* (2010) 48 Cal.4th 691, 719 (*Redd*).)

The standard of appellate review of a trial court's ruling on a motion to suppress is well-established. We defer to the trial court's factual findings—express or implied—where substantial evidence supports them. In determining whether, on those facts, the search or seizure was unreasonable under the Fourth Amendment, we exercise our independent judgment. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119; *Redd, supra,* 48 Cal.4th at p. 719.)

**1.** ***The investigatory detention was lawful***

Our Supreme Court has "consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning." (*People v. Mickelson* (1963) 59 Cal.2d 448, 450.) "[A]n officer of the law, employed to maintain the peace and to prevent crime, as well as to apprehend criminals after the fact, has both the right and the duty to make reasonable investigation of all suspicious activities even though" their nature "may fall short of grounds sufficient to justify an arrest or a search of the persons or the effects of the suspects." (*People v. Cowman* (1963) 223 Cal.App.2d 109, 117.)

To justify a temporary detention related to crime, "the detaining officers must have a particularized and objective basis

7

for suspecting the particular person stopped of criminal activity." (*United States v. Cortez* (1981) 449 U.S. 411, 417–418.) A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in the light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The "circumstances known or apparent to the officer must include specific and articulable facts which, viewed objectively, would cause a reasonable officer to suspect that (1) some activity relating to crime has taken place or is occurring or is about to occur, and (2) the person the officer intends to stop or detain is involved in that activity." (*People v. Conway* (1994) 25 Cal.App.4th 385, 388 (*Conway*).)

In making reasonable suspicion determinations, reviewing courts must consider the totality of the circumstances of each case. (*United States v. Arvizu* (2002) 534 U.S. 266, 273.) That the circumstances also may be consistent with lawful activity does not render the detention invalid. "The possibility of an innocent explanation does not deprive the officer of the capacity to entertain a reasonable suspicion of criminal conduct. Indeed, the principal function of [her] investigation is to resolve that very ambiguity and establish whether the activity is in fact legal or illegal—to 'enable the police to quickly determine whether they should allow the suspect to go about [her] business or hold [her] to answer charges.' " (*In re Tony C.* (1978) 21 Cal.3d 888, 894. See also *Arvizu*, at pp. 274–278.) The guiding principle in determining the propriety of an investigatory detention is "the reasonableness in all the circumstances of

8

the particular governmental invasion of a citizen's personal security." (*Terry v. State of Ohio* (1968) 392 U.S. 1, 19.)

Dilelio testified at the hearing on the suppression motion that deputies had "received a prowler call." The informant caller described a Hispanic woman wearing a colored shirt and dark blue pants riding a bicycle away from the residence. When Dilelio and her partner arrived at the reported address a few minutes later, Dilelio saw a woman matching that exact description, riding a black bicycle.

Dilelio did not stop and detain Icea "predicated on mere curiosity, rumor, or hunch." (See *In re Tony C.*, *supra*, 21 Cal.3d at p. 893.) The 911 call sheriffs had received from the witness did not merely say that a person was seen leaving the property on a bicycle. The witness reported a prowler at the home. A "prowler" is typically defined as a person who moves stealthily around or loiters near a place with a view to committing a crime, especially burglary. (See, e.g., https://www.merriam-webster.com/dictionary/prowler [as of Mar. 27, 2025], archived at <https://perma.cc/GQA4-9Q3S> ["a person who moves through an area or place in a quiet and stealthy way in order to commit a crime"]; <https://dictionary.cambridge.org/us/dictionary/english/prowler> [as of Mar. 27, 2025], archived at <https://perma.cc/RG85-XG6A> ["someone who moves about quietly in a place, trying not to be seen, often before committing a crime"].)

Dilelio had dispatched a helicopter to fly over the location. The record is unclear as to whether, when Dilelio arrived at the scene minutes after the call came in, she had been informed of Marr's observations (which, among other things, confirmed the witness caller's description of the person he'd seen at the

property).[5]  According to the testimony at the hearing, the events unfolded in a matter of minutes.

In any event, when Dilelio asked Icea to stop and get off the bike, Dilelio had information that a witness had called 911 to report prowler activity, that witness had given a fairly detailed description of the suspicious person, and Icea matched that description.  These facts were sufficient to establish that a reasonable officer would have had a reasonable suspicion that criminal activity was occurring or had occurred, and that the woman on the bike wearing clothing described in the 911 call was involved in that activity.  Accordingly, Dilelio's investigatory stop of Icea was lawful.  (See *People v. Wells* (2006) 38 Cal.4th 1078,

---

[5]  That witness who called authorities turned out to be Uriel Aguilar, Jr., Crisostomo's neighbor on West 230th Street.  At trial, Aguilar testified he had gone out for a walk around 1:25 p.m. on March 15, 2016.  He saw a woman—later identified as Icea—riding a bike down the street.  The street ends in a cul-de-sac.  At the cul-de-sac, Icea started circling and circling on her bike for about five minutes.  Icea then rode up the driveway.  Aguilar saw Icea "trying to open the wooden gate" on the right side of the house.  Icea was "pulling on the gate, and the gate [wouldn't] open."  Next she tried to open the front door.  Then she walked over to a steel gate on the left side of the house, opened it, and walked towards the back of the house.  Aguilar called the sheriff's department.  Aguilar's 911 call was played for the jury at trial.  Aguilar told the operator, "There's a break in at [address] West 230th Street."  Aguilar confirmed it was "happening right now."  Aguilar gave a description of the woman.  As Aguilar was on the phone with the operator, Icea came out of the house carrying a backpack and began riding west on the bike.  Aguilar then told the operator the helicopter was "overhead but he's in the wrong position.  He should be further south."

1080–1081 [limited traffic stop and detention of driver based solely on uncorroborated phoned-in tip that accurately described vehicle and location was permissible to confirm officer's reasonable suspicion of intoxicated driving]; *People v. Little* (2012) 206 Cal.App.4th 1364, 1371–1373 [trial court did not err in denying suppression motion where officer in field heard dispatch with description of truck and two suspects; 33 minutes later officer spotted a truck matching the description with two occupants also matching the description; officer made traffic stop, searched the truck, found victim's property]; *People v. Superior Court (Backey)* (1978) 85 Cal.App.3d 1020, 1024 [suspect fit description by citizen informant in police radio report, was reported as " 'concealing something under his coat,' " and had pockets full of large items]; *Conway*, *supra*, 25 Cal.App.4th at pp. 388, 390 [officer received report of burglary in progress in residential area; within two minutes he saw vehicle and two passengers coming from area of reported burglary; no other pedestrians or vehicles in area]; *People v. Ramirez* (1996) 41 Cal.App.4th 1608, 1611, 1619–1620 [anonymous tip about drug dealing was corroborated by officers' observations]. Cf. *Navarette v. California* (2014) 572 U.S. 393, 398–404 [caller's use of 911 emergency number added to reliability of call because the 911 system permits law enforcement to verify important information about the caller, and thus "a reasonable [police] officer could conclude that a false tipster would think twice before using such a system"].)

2.   ***The deputies did not exceed the scope of the consent Icea gave them to look into her purse***

Icea also contends she "did not give permission for a general search of [her] purse or for any . . . item [other than her

11

I.D. card] to be removed." Icea implicitly—and correctly[6]—seems to have abandoned the testimony she gave at the suppression hearing that Romero never asked her for identification and the deputies never asked if they could "go into" her purse. Instead, Icea argues "Deputy Romero exceeded the scope of [her] consent by removing the vehicle title paperwork from [her] purse. A reasonable deputy would not mistake a vehicle title document for an I.D. card." Icea asserts "there was no testimony that the vehicle title was in plain view and immediately identifiable as a *stolen* item."

"Consent to a search is a recognized exception to the Fourth Amendment's warrant requirement." (*People v. Cantor* (2007) 149 Cal.App.4th 961, 965.) Dilelio testified at the suppression hearing that Icea told Dilelio her I.D. was in her purse and "told [her] to get it." The following exchange then took place:

> "Q: [D]id you see your partner attempt to retrieve the I.D.?
> "A: Yes, I did, ma'am.
> "Q: And while he did so, what did you observe?
> "A: He actually retrieved her I.D. along with a vehicle title to the residence that was just burglarized.

---

[6] As the factfinder in a suppression hearing, the trial court retains the power to "judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences in deciding whether a search is constitutionally reasonable." (*People v. Woods* (1999) 21 Cal.4th 668, 673.) Here, the trial court judged the credibility of the two witnesses who testified, Emily Dilelio and Icea.

"Q: And did you see where the vehicle title was
    when . . . he opened the purse?
 "A: It was right in the middle of the purse,
    ma'am.
"The Court: It was right what?
"A: Right in the middle. As you open it, just
    as soon as you—
"The Court: Right in the middle? Is that what
    you said, 'the middle?'
"A: The middle, yes, sir."

Testifying on her own behalf, Icea said her I.D. was in "an inside pocket on the inside that was zipped up, and it was inside there." We are not persuaded by Icea's apparent contention that Romero should have ignored a document—one bearing the address of the location in question[7]—that was "right in the middle" of the purse when Romero opened it, and instead have dug down into a zippered pocket to withdraw only her I.D.

The warrantless search of an object in plain view does not violate a reasonable expectation of privacy when (1) the officers made their observations from a place where they had a right to be; (2) the incriminating character of the object was immediately apparent; and (3) the officers had a lawful right of access to the object itself. (*Horton v. California* (1990) 496 U.S. 128, 136–137.) Here, Dilelio and Romero had the right to be in front of the victim's house on a public street; the "incriminating character" of the document that was the title to the victim's car was apparent; and the deputies had the lawful right to take that title

---

[7]    Victim Crisostomo testified at trial that the title to his car, which he'd received in the mail from the Department of Motor Vehicles, had been on the dining room table in his home.

as evidence of the burglary.  Probable cause connecting an item in plain view with criminal activity "is a flexible, commonsense standard, which requires only that the facts available to the officer would warrant a person of reasonable caution in believing that the item may be contraband or stolen property or evidence of a crime.  No showing is required that such a belief is correct or more likely true than false." (*People v. Stokes* (1990) 224 Cal.App.3d 715, 719.)  Moreover, a reasonable suspicion short of probable cause may justify a brief inspection of an object in plain view.  (*People v. Clark* (1989) 212 Cal.App.3d 1233, 1238–1239.)

     In sum, neither the deputies' investigatory detention of Icea nor the removal of the incriminating evidence from her purse was unlawful.  The trial court did not err in denying Icea's motion to suppress the evidence against her.

**DISPOSITION**

We affirm Alva L. Icea's conviction.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


EDMON, P. J.


HANASONO, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.